Clifton R. QUALLS

v.

The UNITED STATES.

No. 285–79C.

United States Court of Claims.

May 5, 1982.

conclusion that Article XII should not be so read, we need not and expressly do not reach the I.R.C. § 906 issue.

George D. McCrary, III, Memphis, Tenn., attorney of record, for plaintiff.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and KASHIWA and BENNETT, Judges.

## OPINION

PER CURIAM:

This civilian pay case comes before the court on the exceptions of the parties to the opinion and findings of Trial Judge Mastin G. White, filed April 7, 1981, pursuant to Rule 134(h). Oral argument has been heard in this matter. Since the court agrees with the decision of the trial judge, as hereinafter set forth,[1] it hereby affirms and adopts that decision, with minor modification, as the basis for its judgment in this case, together with the following supplemental discussion.

The underlying basis of plaintiff's claim before the court is the alleged violation of his substantive rights as protected by the Fair Labor Standards Act (the act or FLSA), 29 U.S.C. §§ 201 et seq. (1976 & Supps.).[2] In his brief before the court and again at oral argument, plaintiff took exception to the trial judge's failure to discuss these alleged violations within the context of the Act. While we agree that a more thorough treatment of the Act as applied to the facts of this case was warranted, we find it to be implicit in the decision of the trial judge that no violations thereof occurred which are cognizable in this court.

---

1. While the court adopts the trial judge's separate findings of fact, filed April 7, 1981, they are not printed herein since such facts as are necessary to the decision are contained in the opinion.

2. The federal government, as an employer, became subject to the Fair Labor Standards Act upon the passage of the Fair Labor Standards Amendments of 1974, Pub.L.No.93–259, § 6(a)(1), 88 Stat. 58 (amending 29 U.S.C. § 203(d) (1970)).

Plaintiff invokes the jurisdiction of the court under section 216(b) of the Act.[3] Generally, section 216(b) authorizes a private right of action for recovery of unpaid minimum wages, unpaid overtime compensation and violations of section 215(a)(3) of the Act.[4] This provision further provides that such action may be maintained in any federal or state court of competent jurisdiction.

Plaintiff's original claim involved the defendant's failure to pay overtime compensation and travel expenses (mileage and per diem) in connection with his transfer to the Huxtable Pumping Plant (Huxtable) near Marianna, Arkansas, allegedly in violation of section 207(a) of the Act, which requires compensatory overtime for hours worked in excess of 40 per week, and various provisions of the Joint Travel Regulations issued pursuant to title 5 of the United States Code.

■ This court has previously held that it has jurisdiction to determine violations of section 207 of the FLSA as provided by section 216(b). *Beebe v. United States,* 226 Ct.Cl. ——, ——, 640 F.2d 1283, 1288–89 (1981). Our general jurisdictional statute also is construed as empowering the court to render judgment on any claim founded on a statute or regulation expressly or by implication mandating the payment of money damages for violation thereof. 28 U.S.C. § 1491 (Supp. II 1978). Defendant has interposed no objections to our review of plaintiff's claim for travel time and expenses with respect to his assignment to Huxtable, and indeed it cannot, for we are clearly authorized to consider the matter.

Section 207(a) of the Act requires that an employee receive compensatory overtime if he shall be "employed" for a workweek longer than 40 hours. Within the meaning of the Act, "employ" includes "to suffer or permit to work." 29 U.S.C. § 203(g) (1976). The application of these overtime provisions of the Act to federal employees has been explained by a series of letters published by the United States Civil Service Commission. One such letter, Federal Personnel Manual (FPM) Letter 551–10, issued April 30, 1976, and entitled "Travel Time as 'Hours Worked' Under FLSA," explains the criteria to be used in determining what periods of time spent by employees will be considered "hours of work" for compensation purposes. As stated in paragraph 3 of FPM Letter 551–10, "authorized travel time outside regular working hours is 'hours of work' under FLSA if an employee * * * (2) travels as a passenger to a temporary duty station and returns during the same day, * * *."

■ Thus, essential to a determination in plaintiff's favor on this aspect of his claim is a finding that during plaintiff's assignment to Huxtable, he was in a temporary duty status and required to commute from his permanent duty station in Memphis. However, the trial judge found that, in fact, plaintiff had been permanently assigned to Huxtable and that it was by his own choice that he incurred the costs and inconvenience of commuting to his worksite. We are in complete agreement with this finding. Plaintiff has shown no en-

3. Section 216(b) provides in pertinent part:
 "Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Any employer who violates the provisions of section 215(a)(3) of this title shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) of this title, including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages. An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."

4. Section 215(a)(3) provides in pertinent part that it shall be unlawful for any person "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, * * *."

titlement to recovery under section 207(a) of the Act.

Nor has plaintiff established any entitlement to travel expenses under title 5. Plaintiff's claim for reimbursement in reliance on Memphis District Memorandum No. 55–1–1 is flawed for exactly the same reason as his claim under the FLSA. Both paragraphs of the memorandum to which we are directed clearly condition reimbursement on travel to a temporary duty station, a condition plaintiff has failed to satisfy.

The remainder of plaintiff's claim before the court rests on the alleged violation of section 215(a)(3) of the Act, which prohibits discrimination against an employee asserting a claim under the FLSA. Specifically, plaintiff alleges that the delay in his eventual promotion to grade GS–09 and then grade GS–11 and his transfers to Cairo, Illinois, and Caruthersville, Missouri, were in retaliation for his having instituted an action to recover damages in connection with his assignment to Huxtable. Although not succinctly stated, plaintiff seeks such legal and equitable relief as may be appropriate to remedy defendant's alleged retaliatory acts.

 However, this court is not a competent forum, as required by section 216(b), to adjudicate this aspect of plaintiff's claim. As pointed out by the trial judge, our ability to consider these matters is precluded by the often-articulated limits on our jurisdiction. The circumscription of our ability to promote a government employee and award back pay is well recognized, *United States v. Testan,* 424 U.S. 392, 402, 96 S.Ct. 948, 955, 47 L.Ed.2d 114 (1975); *Guy v. United States,* 221 Ct.Cl. 427, 439–40, 608 F.2d 867, 874 (1979), and we see no reason to repeat the trial judge's discussion of this subject. It suffices to say that plaintiff has demonstrated no clear, legal entitlement to a promotion in this case. Moreover, to the extent that plaintiff charges defendant with acting in a discriminatory or retaliatory manner towards him, such allegations are tortious in nature, as held by the trial

judge, and are not actionable in this court.[5] *Eastport S.S. Corp. v. United States,* 178 Ct.Cl. 599, 609, 372 F.2d 1002, 1010 (1967). In sum, the court does not have jurisdiction in this case over the subject matter of plaintiff's claim with respect to the alleged violations of section 215(a)(3) of the FLSA.

OPINION OF THE TRIAL JUDGE

WHITE, *Senior Trial Judge:* The plaintiff, an electrical engineer who has been employed as a civilian by the Memphis District, Corps of Engineers, U.S. Army, since February 11, 1974, sues for damages because the Government has denied him various benefits to which he claims entitlement.

The action was begun in a United States District Court, and was transferred here in 1979 because the amount sought by the plaintiff was in excess of a district court's jurisdiction under the Tucker Act (28 U.S.C. § 1346(a)(2)). It is my opinion that the plaintiff has not established any legal basis on which this court can grant a recovery.

*Delayed Promotions*

One claim asserted by the plaintiff is that he should have been promoted by the Memphis District from grade GS–07 to grade GS–09 in February 1976 (instead of August 1976), and that if he had been promoted to grade GS–09 in February 1976, he would have been promoted from grade GS–09 to grade GS–11 in February 1977 (instead of September 1978). The plaintiff seeks to recover a total of $4,437.17 because of the delayed promotions.

After graduating from Memphis State University in May 1973 with a degree in electrical engineering, the plaintiff began his employment with the Memphis District on February 11, 1974. At that time, he was placed in what is referred to as the Rotational Training Program for Junior Level Engineers. This is customarily a 2-year program.

Upon entering the rotational training program in the Memphis District, an engi-

---

5. It is apparent from the trial judge's opinion and findings that the events which occurred were not the result of plaintiff's having filed suit under the Fair Labor Standards Act.

neer trainee's permanent duty station is the headquarters of the Memphis District in Memphis, Tennessee, and he is assigned to the District's Personnel Office for purposes of administration. However, the engineer trainee does not perform any duties in the Personnel Office. Instead, the rotational training program involves a series of temporary rotational training assignments to different aspects of the District's engineering work, so that the engineer trainee will become familiar with the District's mission and its technical engineering functions, and thus be prepared for a permanent assignment at the end of the 2-year rotational training period. The various rotational training assignments are for different periods of time, but the average period on such an assignment is about a month.

An engineer trainee customarily enters the rotational training program in grade GS–05. If his performance as a trainee is satisfactory, it is the policy of the Memphis District to promote an engineer trainee to grade GS–07 at the end of the first year and to grade GS–09 at the end of the second year, when the rotational training program is customarily completed and the trainee enters upon his first permanent assignment as a regular employee of the District.

An engineer trainee's performance on each rotational training assignment is evaluated by the official under whose supervision he works during the assignment. Under a general instruction from the Memphis District, the supervisor is directed to prepare a written evaluation, on a form prescribed by the District, within 5 days after the trainee completes an assignment and to submit the evaluation report to the District's Personnel Office.

In accordance with the policy of the Memphis District, the plaintiff on February 11, 1974, entered the rotational training program in grade GS–05. After satisfactorily completing certain rotational training assignments during the next 12-month period, the plaintiff was promoted to grade GS–07 effective February 15, 1975. Following the completion by the plaintiff in

February 1976 of the second year of the rotational training program, the official under whose supervision the plaintiff had been working since November 3, 1975, prepared a favorable evaluation report on the plaintiff's work during the period just mentioned, and recommended that the plaintiff "be promoted to GS–09 since he has completed the rotational training program and is presently performing at that level." In this connection, the evidence shows that since November 3, 1975, the plaintiff had been performing satisfactorily the duties of a position that warranted a classification in grade GS–09.

However, the plaintiff was not promoted to grade GS–09 in February 1976, as was customary after an engineer trainee had completed 2 years in the rotational training program. Instead, the District's Personnel Director recommended to the Deputy District Engineer that the plaintiff be retained in the rotational training program, and in grade GS–07, for an additional period of 6 months, with the plaintiff's supervisor being instructed to render another evaluation report at the end of the 6-month period. This recommendation was approved by the Deputy District Engineer; and the plaintiff was retained in the rotational training program, and in grade GS–07, after February 1976.

The evidence in the record indicates that the principal reasons for the Personnel Director's unfavorable recommendation—on the basis of which the plaintiff was retained in the rotational training program, and his promotion from grade GS–07 to grade GS–09 was delayed, beyond the end of the customary 2-year rotational training period—was that a supervisor in the Mechanical and Electrical Section, under whom the plaintiff had worked on a rotational training assignment for approximately 5 weeks in 1975, rendered a very unfavorable and prejudicial evaluation report on the plaintiff's performance during that assignment. There are certain factors in connection with this evaluation report that should be noted.

In the first place, the plaintiff's rotational training assignment to the Mechanical

and Electrical Section ended on October 31, 1975. The evaluation report on the plaintiff with respect to this assignment was not prepared until March 5, 1976, or more than 4 months after the assignment ended. The purpose of the requirement prescribed by the Memphis District that supervisors of engineer trainees prepare and submit their evaluation reports within 5 days after the end of rotational training assignments was, obviously, to assure that such reports would reflect the fresh and accurate recollections of supervisors concerning the nature and quality of the work done by engineer trainees during their rotational training assignments. The accuracy and fairness of the evaluation report rendered on the plaintiff by the supervisor in the Mechanical and Electrical Section more than 4 months after the plaintiff had completed that particular rotational training assignment must be regarded as suspect, because it was in gross violation of the 5-day time limit prescribed by the Memphis District. It appears that this element of doubt should have caused the Director of Personnel and the Deputy District Engineer to discard or ignore the particular evaluation report in considering whether the plaintiff was entitled to be taken out of the rotational training program and promoted to grade GS–09 at the end of the customary 2-year rotational training period.

Moreover the evidence in the record shows that on two occasions between the completion of the plaintiff's rotational training assignment in the Mechanical and Electrical Section and March 5, 1976, when the evaluation report on the plaintiff for that assignment was prepared, the plaintiff orally asked the supervisor about his rating, and the supervisor reported that the plaintiff had received a good rating.

It is probable that the evaluation report on the plaintiff with respect to his rotational training assignment to the Mechanical and Electrical Section did not fairly reflect the nature and quality of the plaintiff's performance on this particular assignment. It certainly was not consistent with the evaluation reports on the plaintiff's rotational training assignments to other aspects of the Memphis District's engineering activities. In any event, the plaintiff's overall performance as an engineer trainee during the 2-year period between February 1974 and February 1976, which was supposed to constitute for the plaintiff the 2-year rotational training period, was undoubtedly satisfactory, as shown by the following circumstances: the plaintiff received a within-grade salary increase in February 1976, on the basis of a satisfactory overall performance as an engineer trainee; he was officially certified by the District's Personnel Office in February 1976 as fully qualified for a permanent electrical engineer position in grade GS–09 (the details will be outlined later); and, as of February 1976, he had actually been performing work at the GS–09 level satisfactorily for more than 3 months.

■ The rule is well established that the courts are not empowered to promote a government employee to a higher grade, or to grant an employee judgment for the pay of a higher grade, unless the employee can clearly show a legal entitlement to such a remedy based upon a statutory provision or regulation. *United States v. Testan,* 424 U.S. 392, 402, 96 S.Ct. 948, 955, 47 L.Ed.2d 114 (1975); *Skrobot v. United States,* 208 Ct.Cl. 475, 479–80, 534 F.2d 237, 239–40 (1975); *Guy v. United States,* 221 Ct.Cl. 427, 439–40, 608 F.2d 867, 874 (1979); cf. *Selman v. United States,* 204 Ct.Cl. 675, 498 F.2d 1354 (1974). In the present case, the plaintiff has not called the court's attention to any statutory provision or regulation which mandated the plaintiff's promotion from grade GS–07 to grade GS–09 in February 1976 (or at any other time). Even if, as plaintiff argues, the delay in his promotion to grade GS–09 was unfair and inconsistent with the customary policy of the Memphis District regarding the promotion of engineer trainees, it is not a sufficient basis on which the court can grant relief to the plaintiff.

■ Even if the evidence showed—as it does not—bad faith on the part of the supervisor in the Mechanical and Electrical

Section who rendered the unfavorable evaluation report on the plaintiff, or on the part of the Personnel Director who recommended that the plaintiff's promotion to grade GS–09 be delayed for 6 months, or on the part of the Deputy District Engineer who approved the Personnel Director's recommendation, no remedy for such tortious conduct could be provided here. This court lacks jurisdiction over a case sounding in tort, "regardless of how vicious or malicious the tort may be." *McCreery v. United States*, 161 Ct.Cl. 484, 488 (1963).

■ Another aspect of the plaintiff's claim that he should have been promoted from grade GS–07 to grade GS–09 in February 1976, and that, if so promoted, he would subsequently have been promoted to grade GS–11 in February 1977 (instead of September 1978, when he was actually promoted to grade GS–11), should also be mentioned.

On February 5, 1976, the Memphis District announced a vacancy in a permanent electrical engineer position, grade GS–09 (with a promotion to grade GS–11 upon 1 year of satisfactory service), at the Ensley Yard in Memphis. The plaintiff and another electrical engineer trainee named Tom Verna (and perhaps others) applied for the position at the Ensley Yard. The plaintiff was a 5-point veteran and Tom Verna was not a veteran. The plaintiff and Tom Verna had entered the rotational training program as electrical engineer trainees at about the same time in February 1974; and they were both promoted to grade GS–07 on the same day, February 15, 1975. Both were still in grade GS–07 when they applied for the GS–09 position at the Ensley Yard.

The plaintiff and Tom Verna were certified by the Personnel Office to the appointing official, in a selection register dated February 13, 1976, as the best qualified candidates for the GS–09 position at the Ensley Yard.

Tom Verna was selected by the appointing official for the GS–09 position at the Ensley Yard. He was released from the rotational training program and promoted to grade GS–09 upon assuming the position

at the Ensley Yard in February 1976; and he was promoted to grade GS–11 a year later, as the technical difficulty of the work involved in that position was sufficient to warrant a classification in the GS–11 grade.

The evidence in the record does not reflect the comparative qualifications, technical and otherwise, of Tom Verna and the plaintiff for the GS–09 position at the Ensley Yard, except that the plaintiff was a 5-point veteran and Tom Verna was not a veteran. The official who selected Tom Verna for the position gave the following reasons for selecting Mr. Verna over the plaintiff:

> Both candidates have worked under my immediate supervision during their trainee periods. Both are capable men in their knowledge of electrical engineering, however, Mr. Verna is superior in his handling of job procedures, personnel management, communications. In my judgment Mr. Verna is the better candidate.

In the absence of evidence to the contrary, it must be presumed that the official who selected Tom Verna over the plaintiff for the GS–09 position at the Ensley Yard acted in good faith. *See Knotts v. United States*, 128 Ct.Cl. 489, 492, 121 F.Supp. 630, 631 (1954); *Greenway v. United States*, 175 Ct.Cl. 350, 362, *cert. denied*, 385 U.S. 881, 87 S.Ct. 167, 17 L.Ed.2d 108 (1966).

Even if the evidence in the record showed that the plaintiff's qualifications, technical and otherwise, for the position at the Ensley Yard were superior to those of Tom Verna, and, therefore, that the appointing official exercised bad judgment in selecting Tom Verna for the position, the court would not be able to grant relief to the plaintiff. Administrative officials have "the discretion to make both good and bad decisions on personnel matters." *Hirsch v. United States*, 205 Ct.Cl. 256, 259, 499 F.2d 1248, 1250 (1974).

■ The plaintiff's status as a 5-point veteran did not entitle him to any preference over Tom Verna, a non-veteran, in their competition for the GS–09 position at the Ensley Yard. A veteran is entitled to

preference over non-veterans only in connection with an initial appointment to the federal service or in connection with a reduction-in-force among personnel in the same competitive level, neither of which was involved in the competition between the plaintiff and Tom Verna for the position at the Ensley Yard.

For the reasons stated in this part of the opinion, neither the delay from February 1976 to August 1976 in the plaintiff's promotion from grade GS–07 to grade GS–09, nor the delay from February 1977 to September 1978 in his promotion from grade GS–09 to grade GS–11, provides an adequate legal basis for a recovery by the plaintiff.

### Assignment to Huxtable

The plaintiff also asserts a claim for damages against the Government in connection with an assignment which he received for the performance of duties at the Memphis District's Huxtable Pumping Plant, located near Marianna, Arkansas.

In 1975, the Memphis District was in the process of constructing the Huxtable Pumping Plant ("Huxtable"). In the late summer or early fall of 1975, at a meeting that included the District Engineer and the Chief of the District's Construction Division, the resident engineer in charge of construction at Huxtable reported that he needed additional personnel for the completion of the construction work at Huxtable, which was expected to take a year or more, and that an electrical engineer was among the additional personnel needed. Sometime after the meeting, the District Engineer decided that the plaintiff would be assigned to Huxtable for the remainder of the construction period. The District Engineer orally instructed the District's Personnel Director to notify the plaintiff of the assignment.

At the time when the plaintiff was selected for the electrical engineering work at Huxtable, he was still in the rotational training program. It was the intention of the Memphis District that the work at Huxtable was to be the plaintiff's terminal rotational assignment and his first permanent assignment upon being released from the rotational training program. It was expected at the time of the plaintiff's selection for the work at Huxtable that the plaintiff would be released from the rotational training program in February 1976, at the end of the customary 2-year rotational training period, and that he would be promoted to GS–09 at that time. The electrical engineering work at Huxtable warranted a classification in grade GS–09.

On October 30, 1975, the Director of Personnel called the plaintiff into his office and orally informed the plaintiff: that the plaintiff had been selected for the electrical engineering work at Huxtable; that such work was expected to last for the remainder of the construction program at Huxtable, or approximately 1 year; that the transfer would involve a permanent change of station for the plaintiff, and formal PCS orders would be issued by the Personnel Office whenever the plaintiff requested such orders; and that when the plaintiff was released from the rotational training program, which was expected to be in February 1976, he would be promoted to grade GS–09.

Under the PCS orders, which were to be issued whenever the plaintiff requested them, the Government would reimburse the plaintiff: for the cost of moving his family and household goods from Bartlett, Tennessee (a suburb of Memphis, where the plaintiff maintained his home), to Marianna, Arkansas; for the expenses involved in the sale of the plaintiff's home in Bartlett and the purchase of a home in Marianna; for the cost of temporary quarters in Marianna for a maximum period of 30 days; and for other miscellaneous expenses involved in the move.

However, the plaintiff informed the Personnel Director at the meeting on October 30, 1975, that it was not feasible for him to move his family to Marianna, because his wife held a permanent position in Memphis as a librarian at Memphis State University and, in addition, his wife had the responsibility for the care of an ailing grandmother,

who lived in the Memphis area. The plaintiff requested that he be assigned a government-owned automobile to use in driving between his home in Bartlett and Huxtable each work day. The Director of Personnel responded that the plaintiff could use a government-owned automobile to go to Huxtable the following day in order to meet the personnel working there, but neither the plaintiff nor anyone else working at Huxtable could be given the privilege of using a government-owned automobile on a regular basis for transportation to and from work.

The plaintiff, using a government-owned automobile, made a round trip to Huxtable on October 31, 1975, and met the resident engineer and other personnel working at the pumping plant project.

The plaintiff began the performance of his regular duties at Huxtable on November 3, 1975. Shortly thereafter, the plaintiff had another conversation with the Director of Personnel and insisted, in the alternative, that he be furnished a government-owned automobile for transportation between his home in Bartlett and Huxtable each work day, or that he be paid mileage for the use of his personally owned automobile on the trip, or that he be assigned to Huxtable on temporary duty ("TDY") orders and thus receive per diem in lieu of subsistence while working at Huxtable. The plaintiff's alternative requests were refused by the Director of Personnel, who said that none of the personnel working at Huxtable on a regular basis was entitled to such benefits.

The position taken by the Director of Personnel in the conversations with the plaintiff were confirmed by the Director in a communication which he addressed to the plaintiff on December 12, 1975. This communication stated in part as follows:

2. Your assignment at that [Huxtable] construction site is permanent for the duration of the construction phase of the pumping plant. You are authorized travel orders at any time which will afford you all the benefits of a Permanent Change of Station. (These may be written by Mrs. Pat Coveny, TSO, this office, upon notification from you. Her phone number is 534–3824).

The plaintiff worked at Huxtable on a regular basis from November 1975 until May 1977, when his work there was completed. During the first 3 months of the assignment, the plaintiff travelled between his home in Bartlett, Tennessee, and Huxtable as a member of a car pool that consisted of personnel who lived in the Memphis area and worked at Huxtable. The plaintiff used his personally owned automobile for approximately one-third of the time while he was a member of the car pool. At the end of about 3 months, the plaintiff withdrew from the car pool because of the inconvenience connected with it. Thereafter (except for 1 week, when the plaintiff lived in a trailer at Huxtable), the plaintiff travelled alone in his personally owned automobile between his home and Huxtable each work day until May 1977, when his work at Huxtable was completed and he was transferred to another assignment (which will be discussed later).

It should be mentioned in this connection that the plaintiff orally informed the Director of Personnel on November 29, 1976 (more than a year after the plaintiff was assigned to Huxtable) that he had decided to move to Marianna for the remainder of the construction work at Huxtable. The Personnel Office thereupon, on December 6, 1976, issued formal "Confirmatory" PCS orders authorizing reimbursement of the plaintiff, up to a total amount of $1,832, for the costs involved in moving his family and household goods from Bartlett, Tennessee, to Marianna, Arkansas. However, the plaintiff did not utilize the PCS orders, as he did not move his family and household goods to Marianna. Instead, the plaintiff continued to commute in his personally owned automobile each work day between his home in Bartlett, Tennessee, and Huxtable, until the completion of his work at Huxtable in May 1977.

The distance between the plaintiff's home in Bartlett, Tennessee, and Huxtable was 77 miles; and it took the plaintiff an aver-

age of about 2 hours to cover this distance in his personally owned automobile. Thus, the round trip each work day involved a total distance of 154 miles and a total of 4 hours' driving time, on the average.

With respect to the 1½ years of the plaintiff's assignment to Huxtable: he was never compensated, on an overtime basis or otherwise, for the 4 hours per work day (on the average) that he spent in driving between his home and Huxtable; he was never paid mileage for the use of his personally owned automobile on the daily 154-mile round trip; and he never received any per diem allowance in lieu of subsistence.

The plaintiff, in connection with the assignment to Huxtable, asserts a claim (exclusive of the delayed promotions aspect) in the total amount of $20,336.38, covering the period from November 3, 1975, until December 6, 1976. This total is made up of: (1) $10,209.68, representing overtime compensation for the time spent in commuting between the plaintiff's home in Bartlett, Tennessee, and Huxtable; (2) $5,982.70, representing mileage for the use of the plaintiff's personally owned automobile in commuting; and (3) $4,144, representing per diem in lieu of subsistence for the period previously mentioned.

Although the basis for the plaintiff's claim relative to the Huxtable assignment is not articulated with the degree of clarity that would be desirable, the major contention behind this claim seems to be that it was unlawful for the Memphis District to attempt to change the plaintiff's permanent duty station from Memphis to Marianna until: (1) the plaintiff was released from the rotational training program, which did not occur until August 15, 1976; *and* (2) formal PCS orders were issued to him thereafter, which did not occur until December 6, 1976. Hence, according to the plaintiff, he was necessarily in a temporary duty status while working at Huxtable, up until December 6, 1976.

As previously indicated in the opinion, an engineer trainee's permanent duty station, upon entering the rotational training program, is the headquarters of the Memphis

District in Memphis, Tennessee, and he is assigned to the District's Personnel Office for purposes of administration. His work as an engineer trainee is performed on a series of rotational training assignments to different aspects of the District's engineering activities. The rotational training assignments last for about a month each, on the average. Some of them may be in Memphis, and some may be at places other than Memphis. (Geographically, the Memphis District includes at least portions of Arkansas, Kentucky, Missouri, Illinois, Tennessee, and Mississippi.) If a temporary rotational training assignment requires an engineer trainee to travel from Memphis, he is entitled to the use of a government-owned motor vehicle in travelling to and from the work site, or he is paid mileage if he uses his personally owned motor vehicle. If such an assignment outside Memphis requires an engineer trainee to be absent from his home overnight or longer, the District not only defrays the cost of transportation to the work site, and then back to the trainee's home after the assignment is completed, but the trainee is also entitled to a per diem allowance in lieu of subsistence (lodging, meals, etc.) for the period of his absence from home.

It is the policy of the Memphis District to select a prospective permanent assignment for an engineer trainee approximately 1 or 2 months prior to the completion of the customary 2-year rotational training period. If the prospective permanent assignment is located at a place other than Memphis, it is not unusual for the District promptly to transfer the trainee, on permanent change of station ("PCS") orders, from the District's headquarters in Memphis to the place where he is to work on a permanent basis. In such a situation, the employee undertakes the work at the new duty station as his terminal rotational training assignment, and then as his initial permanent assignment upon being released from the rotational training program.

The plaintiff's assignment to Huxtable fitted the pattern outlined in the preceding paragraph. When he received the assign-

ment effective November 3, 1975, it was the expectation of the Memphis District that he would be performing the work at Huxtable until the completion of the construction program there, which would take at least another year; that the work at Huxtable would constitute the plaintiff's terminal assignment in the rotational training program, which would be completed in February 1976, and the plaintiff's first permanent assignment after being released from the rotational training program; and that the plaintiff's transfer to Huxtable would be accomplished on PCS orders, which would entitle the plaintiff to reimbursement for the expenses involved in moving his family and household goods from the plaintiff's home in Bartlett, Tennessee, to a new home in Marianna, Arkansas, the town nearest to Huxtable. The plaintiff was informed at the outset that the assignment to Huxtable would involve a permanent change of station for him, and that formal PCS orders would be issued whenever he requested them. The delay for more than a year, or until December 6, 1976, in the issuance of the PCS orders was due to the fact that the plaintiff delayed his request for such orders until November 29, 1976.

The facts clearly indicate that when the plaintiff began working at Huxtable, both the plaintiff and the Memphis District understood that this assignment would last throughout the remainder of the construction program at Huxtable, and that the construction program would not be completed for at least another year. Actually, the plaintiff's assignment to Huxtable lasted for more than 1½ years. It would be a denial of reality to hold that, during this period of 1½ years, the plaintiff's permanent *duty* station was at the headquarters of the Memphis District in Memphis (where he did not do any work), and that he was merely on temporary duty at Huxtable.

It was the plaintiff's voluntary choice, based on family considerations, to commute for 4 hours and 154 miles, round trip, each work day for 1½ years, instead of moving his family and household goods, at the expense of the Government, to Marianna, near the work site.

■ Moreover, the plaintiff has not called the court's attention to any statutory provision or regulation which prohibited the Memphis District from effecting a permanent change of station for the plaintiff while he was still involved in the rotational training program. The rule is well established that federal agencies have wide discretion in making geographical reassignments of employees under their jurisdiction. *Comberiate v. United States*, 203 Ct.Cl. 285, 288 (1973).

■ It must be concluded, therefore, that the District Engineer was empowered to change the plaintiff's permanent duty station from the headquarters of the District in Memphis to Huxtable effective November 3, 1975, even though the plaintiff had not yet been released from the rotational training program, and was not released from that program until August 15, 1976.

The circumstance that the District Engineer announced his assignment decision orally and no written PCS orders were issued for more than a year thereafter is immaterial, particularly as the delay in the issuance of the PCS orders was attributable to the plaintiff.

The assignment to Huxtable was undoubtedly inconvenient and expensive for the plaintiff, because of his family situation. However, an electrical engineer was needed at Huxtable, and somebody had to go there. *Cf. order in Bernard Leefer*, 215 Ct.Cl. 1061, 1062 (1978).

*Assignments to Cairo and Caruthersville*

The plaintiff also claims total damages of $15,304.45 for overtime compensation, mileage, and per diem in connection with assignments to Cairo, Illinois, and to Caruthersville, Missouri. (The plaintiff's claim for delayed promotions also involves these periods.) The plaintiff asserts that these assignments were given to him in retaliation for his action in pursuing his legal rights against the Government in connection with the assignment to Huxtable, discussed in the preceding part of this opinion.

As of the times when the plaintiff was assigned to Cairo and to Caruthersville, there was pending in the United States District Court for the Western District of Tennessee a case (Civil Action No. 71–2122) in which the present plaintiff and certain other employees of the Memphis District were seeking damages (and additional relief) because of the Government's alleged "willful and flagrant violation of the Fair Labor Standards Act * * * by reason of its failure to pay wages and overtime for travel to and from duty stations, * * * and for its concurrent failure to pay travel expenses * * *." Insofar as the present plaintiff was concerned, the complaint in the district court case covered the period from November 3, 1975, through August 15, 1976, and was based on the travel time and travel expenses incurred by the plaintiff in travelling each work day between his home and Huxtable during the period mentioned. As indicated earlier, the district court case, insofar as it related to the present plaintiff, was transferred to this court in 1979 because the amount claimed by the plaintiff exceeded the jurisdiction of the district court under the Tucker Act (28 U.S.C. § 1346(a)(2)). The petition subsequently filed by the plaintiff in this court expanded the scope of the plaintiff's claim to include the various matters mentioned in this opinion.

Even if the evidence showed that the official responsible for the plaintiff's assignments to Cairo and to Caruthersville acted in bad faith and gave the plaintiff those assignments in retaliation for the plaintiff's action in suing the Government, such tortious conduct would not be actionable in this court. Cases "sounding in tort" are excluded from this court's jurisdiction under 28 U.S.C. § 1491.

In view of the serious nature of the plaintiff's allegation on this point, it perhaps should be pointed out that the evidence in the record does not sustain the plaintiff's allegation concerning the motivation behind his assignments to Cairo and to Caruthersville.

Sometime prior to March 22, 1977, while the plaintiff was still working at Huxtable, he had a conference with the District Engineer and informed the latter that he was anxious to obtain an assignment in Memphis. The District Engineer responded that there was no vacancy for an electrical engineer in Memphis but that the Memphis District had some projects coming on at Cairo, Illinois, and Cairo was probably where the District Engineer was going to send the plaintiff when he was no longer needed at Huxtable. The plaintiff then said that an assignment to Cairo would create family hardships for him; and the District Engineer replied that it would be necessary for the plaintiff to go where the work was, and the work at the time was in Cairo, Illinois. The District Engineer further said, however, that he would do everything in his power to provide an assignment in Memphis for the plaintiff whenever there should be a job opening for an electrical engineer in Memphis.

By means of a written communication dated March 22, 1977, the plaintiff was officially informed of his proposed reassignment from Huxtable to the Cairo Area Office at Cairo, Illinois, such reassignment to be effective no earlier than 30 days after the receipt of the March 22 communication.

The plaintiff continued to work at Huxtable until May 8, 1977, when he was transferred to Cairo, Illinois, on PCS orders.

After working at Cairo for more than a year, the plaintiff was transferred on PCS orders from Cairo to Caruthersville, Missouri, in July 1978. The assignment to Caruthersville was quite brief, as the plaintiff was finally transferred on PCS orders from Caruthersville to Memphis, his ultimate objective, effective September 10, 1978. He was also promoted from grade GS–09 to grade GS–11 at the same time.

Although the plaintiff's transfers to Cairo and to Caruthersville were on PCS orders, the plaintiff did not regard it as feasible to move his family and household goods from the home in Bartlett, Tennessee. As a result, the plaintiff, while working in Cairo and in Caruthersville, had to undergo the

202

considerable extra expense and inconvenience of maintaining two separate households and of making round trips in his personally owned automobile on weekends between Cairo (or Caruthersville) and Bartlett.

The evidence, however, indicates that the plaintiff was assigned to Cairo, and subsequently to Caruthersville, because he was needed at those places—and not in Memphis, where he wanted to be—and that his suit against the Government did not play any part in the District Engineer's decisions to send the plaintiff to Cairo and, later, to Caruthersville.

### CONCLUSION

Upon the findings of fact as set forth in the trial judge's report and the foregoing opinion, the court concludes as a matter of law that the plaintiff is not entitled to recover. The petition is therefore dismissed.