GREGORY LUMBER
COMPANY, Plaintiff,

v.

The UNITED STATES, Defendant.

Nos. 428–80C, 532–80C, 578–80C, 626–80C,
627–80C, 628–80C, 637–80C, 134–81C,
135–81C, 136–81C, 137–81C and 146–81C.

United States Claims Court.

Jan. 31, 1986.

Edward F. Canfield, Washington, D.C., attorney of record, for plaintiff.

Helene M. Goldberg, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant.

OPINION

REGINALD W. GIBSON, Judge:

## I. INTRODUCTION

This opinion relates to twelve docketed claims filed originally in the predecessor Court of Claims intermittently over the period August, 1980—March, 1981. *See* Appendix A. Each of the dockets avers a separate claim under both the Tucker Act (28 U.S.C. § 1491) and the Contract Disputes Act (§ 10 CDA of 1978, 41 U.S.C. § 609(a)(1)) by the contractor, Gregory Lumber Company, for breach of a "lump sum"[1] timber sale contract with the government. The primary thrust of the timber claims is that the defendant, *inter alia,* either through breach of warranty (as averred in the *initial* petition), or through bad faith, and/or misrepresentation in the inducement (as averred in the *amended* petition), failed to provide plaintiff with, and deprived it of, the approximate quantity of timber which was estimated as recoverable under the contracts.[2] Plaintiff further contends, in that connection, that the twelve contracts facially *estimated* a quantum recovery of timber in the aggregate amount of 53 million net feet of board, while it was able to recover only 39.5 million net feet of board, which resulted in an average shortfall of 26 percent *per contract. See* Appendix B. In addition, five of the docketed claims contain subsidiary performance price adjustment claims. Finally, defendant asserts a counterclaim as to one of the docketed claims.

Prior to the foregoing filings in the predecessor Court of Claims, plaintiff also

---

1. A "lump sum" timber sale is a sale of an essentially unquantified amount of timber which is identified by reference to independent circumstances such as geographic vicinity. For example, in contrast to stating that the sale covers all trees identified by a particular marking, lump sum sales designates geographic boundaries within which all trees found therein, however many, are included. In essence, it is a sale where the price to be paid is *not dependent* upon a quantity of specifically identifiable goods, but is *independent* of the precise quantity of goods to be sold. Each of the plaintiff's timber sale contracts is styled as a lump sum contract. For further discussion, *see Deal v. United States,* 3 Cl.Ct. 151, 155–58 (1983).

2. Plaintiff has also alleged that defendant violated 43 U.S.C. § 1181a (1976) by selling timber to plaintiff at a knowingly inflated price in contravention of that section's mandate to sell the timber at "reasonable prices on a normal market." *See* discussion *infra* at sections I.B. and II.B.2.e.

sought and was denied administrative price adjustments from the contracting officer in all twelve contracts over the period November, 1978—November, 1979. Following thereon, various administrative stages of review have been had, pursuant to appeals from the contracting officer's denials, to the U.S. Department of Interior Board of Land Appeals (IBLA) as well as to the Interior Board of Contract Appeals (IBCA).

Before this court, on January 18, 1983, defendant moved for summary judgment averring that its disclaimers and the plaintiff's warranties, in each of the contracts, preclude *any* recovery by plaintiff based on the alleged timber shortfall for whatever reason. Plaintiff strenuously opposes said motion, and also seeks a stay because of a compelling need for appropriate discovery pursuant to R.U.S.C.C. 56(f). By this opinion, *inter alia*, we grant in part the defendant's motion for summary judgment, treated in effect as a motion to dismiss, and dismiss plaintiff's violation of statute claim (43 U.S.C. § 1181a) on jurisdictional grounds; deny defendant's motion relating to its jurisdictional challenges alleging that plaintiff's bad faith and misrepresentation claims sound in tort; and concomitantly stay a ruling on defendant's motion with regard to the merits of all of plaintiff's

timber underrun claims, *i.e.*, breach of warranty, bad faith, and misrepresentation; and grant plaintiff's motion for limited discovery pursuant to R.U.S.C.C. 56(f).[3] We do so with the abiding conviction that fundamental fairness requires that plaintiff at least receive a reasonable opportunity to discover any and all operative facts peculiarly within the knowledge of the defendant that might bear on the existence of genuine issues of material fact with regard to the unconscionability, bad faith, and misrepresentation claims.

## A. *Background*

As previously noted, pending before this court is a panoply of twelve separate docketed cases each premised on an independent contract and claim.[4] *See* Appendix A. In point of fact, each docket's main breach claim is based on the alleged failure of plaintiff to receive a certain approximate quantum of timber under a separate lump-sum purchase contract with the government. In addition to this main breach claim, there are subsidiary performance related claims in docket Nos. 428–80C, 532–80C, 578–80C, 134–81C, and 146–81C.[5] Finally, there is a performance counterclaim by defendant relating to docket 134–81C.[6]

---

3. *See* detail of conclusions *infra* at section I.D.

4. The U.S. Department of Interior, Bureau of Land Management contract numbers are R090–TS6–64 (428–80C), OR090–TS6–81 (532–80C), OR090–TS7–21 (578–80C), OR090–TS6–95 (626–80C), OR090–TS6–27 (627–80C), OR090–TS6–19 (628–80C), OR090–TS5–73 (637–80C), 36090–TS5–49 (134–81C), OR090–TS6–18 (135–81C), OR090–TS7–8 (136–81C), OR090–TS6–60 (137–81C), and OR090–TS6–75 (146–81C).

5. In docket 578–80C, plaintiff asserts in its third amendment, para. 30, that certain savings produced pursuant to a road design change were not properly credited to reduce plaintiff's overall road usage charge. In docket 134–81C, original petition para. 11, plaintiff seeks the reimbursement of costs related to road usage not contemplated by the original contract, but incurred as a result of a landslide. In docket 146–81C, second amendment para. 17, plaintiff asserts two claims—(a) that defendant provided an inadequate supply of rock from a faulty quarry for the construction of the roads required under the contract, and (b) that defend-

ant's contracting officer made design changes in roads at the site which caused plaintiff to incur additional expenses for which plaintiff is entitled to reimbursement. In docket 428–80C, second amendment count six, plaintiff alleges that defendant "negligently and recklessly, and in violation of the obligations which it assumed in connection with the contract, failed to mark for cutting a number of trees which Gregory had contracted to purchase and had paid for." In return, plaintiff seeks additional trees or a reduction of the contract price. Finally, in docket 532–80C, original petition count five, plaintiff asserts that defendant warranted its total road costs would be $20,146.56, when in fact they were $32,617. Plaintiff claims a refund of $12,-470.44.

6. For its counterclaim in docket 134–81C, defendant asserts a list of breach claims seeking damages for plaintiff's failure (a) to dispose of slash on certain cutting areas as required by section 15 of the contract; (b) to remove all logging debris from specified special stream cleaning areas as required by section 41(d)(3)4 of the contract; and (c) to maintain all fire

The twelve contracts in question were entered into over the period February, 1975 through April, 1977, and are "lump sum" contracts for the sale of timber to be cut from government-owned land. The separate prices as to each contract range from a high of $1,337,107 to a low of $204,030. In total, the cumulative purchase price of the twelve contracts approximates $8.4 million. For this aggregate price, the contracts estimated that plaintiff was to recover over 53 million net feet of board (*i.e.*, lumber). Unfortunately for plaintiff, however, over the twelve contracts, the actual cut allegedly recovered was some 13.8 million board feet short (*i.e.*, 26 percent) of the 53 million net board feet estimated.

Because of this perceived shortfall averaging 26 percent per contract, plaintiff filed claims under each of the contracts with its contracting officer for an equitable adjustment of the various contract prices aggregating $2.2 million. These claims were totally denied whereupon plaintiff appealed eleven of the twelve contracting officer denials to *both* the U.S. Department of Interior Board of Land Appeals (IBLA) and to the Interior Board of Contract Appeals (IBCA). The twelfth docketed claim (428–80C) has never been appealed to either the IBLA or the IBCA. (*See* Appendix A attached.)

What actually happened before these two boards may perhaps be hospitably characterized as utter confusion. For example, before the IBCA, all eleven docketed claims were dismissed. Some (*i.e.*, four) were dismissed for lack of jurisdiction under the

Contract Disputes Act of 1978, 41 U.S.C. § 601 *et seq.* (1982) (CDA) because the claims were decided by the contracting officer prior to the effective date of the CDA, March 1, 1979. The balance (*i.e.*, seven) were dismissed by the IBCA for plaintiff's failure to prosecute.[7] Before the IBLA, only four of the eleven claims filed thereat have been dismissed—those being dismissals on the merits—while seven remain pending before the board to this day.[8]

Following the dilemma created by the apparent overlap of appeals at the board level, and while all eleven appeals were pending before the IBLA, plaintiff also filed, over a period of seven months (between August 1980 and March 11, 1981), petitions in the predecessor Court of Claims for all twelve contract claims. Said petitions alleged *both* Tucker Act and Contract Disputes Act *direct access jurisdiction* in spite of the fact that previous administrative appeals were from the contracting officer's denial to the IBCA. In this court, those petitions alleged essentially the same claim for price adjustment that was before the boards (under various theories) based on the timber underrun, as well as the performance claims contained in several of the dockets.[9] Summary judgment motions were subsequently filed by the government in several of the docketed claims, wherein three separate grounds for dismissal of plaintiff's petitions were asserted. In dockets 532–80C and 626–80C, defendant requested dismissal of the petitions premised on an election of remedies

---

trails on clear cut units 3, 4, 5 and 7 as required by section 41(a)(2)3 of the contract.

7. *See Appeals of Gregory Lumber Co.,* Order Dismissing Appeals With Prejudice (unpublished) (January 23, 1985); *Appeals of Gregory Lumber Co.,* 79–2 BCA (CCH) ¶ 14,065 (1979), *aff'd,* 79–2 BCA (CCH) ¶ 14,176 (1979), *reh. denied,* 80–1 BCA (CCH) ¶ 14,322 (1980).

8. *See Gregory Lumber Co.,* 54 IBLA 309 (1981). In its decision on the merits of plaintiff's underrun claims, in what are Claims Court dockets 134–81C, 135–81C, 136–81C and 137–81C, the IBLA found that "[w]here warranty as to quantity and quality is specifically disclaimed by the Government in a lump sum contract, *only good faith is required of the Government in making its*

*estimates.*" (Emphasis added.) *Id.* at 318. In addition to excepting to the board's holding on the merits, plaintiff also takes strong exception to what it considers to be violations of procedural due process by the IBLA in making this decision. Specifically, plaintiff alleges "[n]either notice, evidentiary submission, argument, nor fair opportunity to be heard in this important matter was allowed by the Board." Notice and Advice to the Court of Action of Interior Board of Land Appeals and Petition for Review, August 28, 1981, Cl.Ct. No. 134–81C. *See* discussion *infra* at section II.B.2.b.(2).

9. *See supra* note 5.

theory, *i.e.*, claiming plaintiff's petitions at the board level (IBCA) precluded direct access review in the predecessor Court of Claims, now this court, under the CDA. In docket 428–80C, defendant's summary judgment motion alleged that plaintiffs' failure to certify its claim before the contracting officer deprived the court of jurisdiction pursuant to the CDA. *See* 41 U.S.C. § 605. Finally, in dockets 134–81C and 146–81C, defendant alleged that because plaintiff had filed beyond the 12-month CDA statute of limitations, plaintiff's direct access suit was also jurisdictionally barred as untimely. *See id.* § 609(a)(3).

In ruling on defendant's foregoing motions, the predecessor Court of Claims refused to find that plaintiff had made a binding election to proceed before the IBCA in docket nos. 532–80C and 626–80C. *Gregory Lumber Co. v. United States*, 230 Ct.Cl. 745 (March 5, 1982). In docket 428–80C, the court similarly refused to dismiss based on the certification issue, adopting the reasoning of *Folk Construction Co. v. United States*, 226 Ct.Cl. 602 (1981), that "when a contracting officer renders a decision *after* the effective date of the Act [CDA] on an uncertified claim submitted *prior* to that date the contractor may proceed under the Act and appeal to this court." *Id.* at 605 (emphasis added); *See Gregory Lumber Co. v. United States*, Ct.Cl. No. 428–80C (unpublished order of March 27, 1981). Whereas for dockets 134–81C and 146–81C, the court dismissed plaintiff's direct access jurisdiction claim ruling that its claims thereunder were untimely because they were not filed within one year following the contracting officer's decision, but remanded the cases to the trial division to determine the proper Tucker Act standard of review (*i.e.*, Wunderlich Act or direct access with a trial *de novo*). *See Gregory Lumber Co. v. United States*,

229 Ct.Cl. 762 (January 8, 1982); *Gregory Lumber Co. v. United States*, 231 Ct.Cl. 712 (June 8, 1982).

However, prior to the time any proceedings were held relative to the remand in docket 134–81C, *supra*, defendant precipitately moved for summary judgment again on January 12, 1982, this time on the merits of plaintiff's case. Limiting said summary judgment motion to docket 134–81C, for reasons that escape this court's understanding of the issues herein, defendant argued that to the extent plaintiff claimed relief from the shortfall by relying on the board's *estimated* recovery figures contained in the contract, such relief is not forthcoming given the fact that defendant had clearly disclaimed in the contract any warranty of quantity. Moreover, the defendant argued that the vitality of plaintiff's position (breach of warranty as to quantity) was further diluted by the fact that it (plaintiff) had warranted that it entered into the contract based on its own inspection and estimate of recoverable timber. In ruling on the defendant's foregoing motion, the Court of Claims found that the defendant's numerous disclaimers against warranty of quantity, in conjunction with the plaintiff's own warranty, effectively precluded plaintiff from recovering as a matter of law. *Gregory Lumber Co. v. United States*, 230 Ct.Cl. 1041, 1043 (June 4, 1982). That court also found for defendant on one of plaintiff's subsidiary claims, and remanded to the trial division on another.[10] In that ruling, given the foregoing procedural state of affairs, the court characterized these circumstances as the "twisted procedural posture of the case." *Gregory Lumber Co.*, 230 Ct.Cl. at 1041 (1982).

Following the Court of Claims' June 4, 1982 order granting in part defendant's motion for summary judgment on the merits in docket 134–81C, plaintiff hastened to

---

**10.** Specifically, the court in 230 Ct.Cl. at 1041 (June 4, 1982) (1) granted defendant's motion for summary judgment relative to the breach of warranty underrun claim; (2) granted defendant's motion for summary judgment relative to the claim for a refund based on additional rock plaintiff required above the contract estimates to complete certain roads; (3) denied defendant's motion for summary judgment and remanded relative to the claim for excess costs due to a landslide; and (4) remanded the resolution of defendant's *counterclaim*.

revive that docket, as well as to preclude the dispositive effect of the 134–81C decision on all of the other dockets, by moving to amend all twelve petitions to include two alternative theories of recovery based on the identical timber underrun claim. Specifically, plaintiff moved to plead alternatively that it is entitled to recover based on the timber underruns because defendant (1) knowingly misrepresented the amount of recoverable timber to induce plaintiff to enter into the contracts; and (2) acted in bad faith in intentionally inducing plaintiff to enter into the contracts with false estimates. Plaintiff's motion to amend was allowed as to all dockets except docket 134–81C. *See Gregory Lumber Co.*, 230 Ct.Cl. at 1047 (July 23, 1982); and the Order (unpublished) dated January 12, 1983.

### B. *Contentions Re: Defendant's Summary Judgment Motion*

Since plaintiff amended its petitions on January 12, 1983 (except as noted, *supra*), by adding the foregoing two issues in eleven of the docketed claims, defendant has now moved for summary judgment in said eleven claims, this time premising its arguments both on jurisdictional grounds (*i.e.*, claims sounding in tort) and on the merits of plaintiff's original (breach of warranty) and amended (bad faith and misrepresentation) claims. Said motion for summary judgment, filed on January 18, 1983, is that which the court addresses by this opinion.[11] Defendant's challenge relating to the jurisdictional issues alleges that plaintiff's misrepresentation and bad faith claims sound in tort and are thus beyond this court's subject matter jurisdiction under the Tucker Act. *See* 28 U.S.C. § 1491 (1982). Concomitantly, defendant also seeks dismissal of plaintiff's violation of statute claims arguing that a violation of 43 U.S.C. § 1181a (1976) does not "mandate compensation" to plaintiff within the standard laid down by the Supreme Court in *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), and affirmed in *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). Regarding the violation of 43 U.S.C. § 1181a (1976), defendant claims: "The Statute does not require the Government to insure reasonable prices to timber purchasers; rather, it protects the government from having to sell at less than reasonable prices in order to meet its 'quota.'" Defendant's Motions for Summary Judgment, January 18, 1983, at 11. For this reason, defendant argues plaintiff's violation of statute claim should be dismissed.

Finally, on the substantive merits of plaintiff's claims, defendant argues that any claim for breach of warranty of quantum, misrepresentation or bad faith based on the accuracy of the estimates is necessarily precluded by the Court of Claims' decision in docket 134–81C. *See Gregory Lumber Co.*, 230 Ct.Cl. at 1041.

In opposition to defendant's motion for summary judgment, plaintiff asserts that its bad faith and misrepresentation claims present genuine triable issues of fact which cannot be summarily disposed of as a matter of law. In particular, plaintiff relies on the Uniform Commercial Code (UCC) and cases interpreting UCC provisions, for the proposition that "[w]here a party breaches the duty to contract in good faith, he is liable to the other party for damages, *irrespective* of whether he otherwise would be legally liable for damages." Plaintiff's Opposition to Defendant's Motions for Summary Judgment, February 15, 1983, at 4. Plaintiff's position, therefore, appears to be that because (a) bad faith cannot be disclaimed as a matter of law, and (b) its existence raises genuine issues of fact, the facts relative to defendant's negotiation, preparation and performance of the contract must be adduced at a trial.

---

11. Defendant's motion for summary judgment encompasses dockets 428–80C, 532–80C, 578–80C, 626–80C, 627–80C, 628–80C, 637–80C, 135–81C, 136–81C, 137–81C, and 146–81C. We address docket 134–81C by *sua sponte* lifting the current stay of proceedings so as to respond to the order of the predecessor Court of Claims on remand issued in 230 Ct.Cl. at 1045 (June 4, 1982).

Regarding the misrepresentation issue, plaintiff asserts, again relying solely on the UCC and cases interpreting its provisions, that "where a party induces another party to enter into a contract based upon a material misrepresentation, the first party may not rely upon the terms of the contract (*i.e.,* the disclaimer) to escape liability." *Id.* at 6. Plaintiff's position essentially parallels that regarding bad faith: The UCC bars the enforcement at law of disclaimers in contracts where the injured party was induced into entering the contract through a misrepresentation of fact. On this authority, therefore, plaintiff also seeks a denial of defendant's motion because of the legal relevance of those facts relative to defendant's alleged misrepresentation in the inducement.

To traverse the summary judgment motion, plaintiff also attempts to distinguish defendant's argument that the earlier decision in 134–81C, *supra* (June 4, 1982), is dispositive of the new theories asserted in plaintiff's *amended* petitions. Plaintiff's argument in this regard stresses the fact that as a matter of logic, since these *amended* claims of bad faith and misrepresentation were not even before the court at the time of the earlier decision in docket 134–81C, *supra,* it is simply not possible for the court to have ruled upon them at that time. In further support of its position, plaintiff refers to the Court of Claims' order of July 23, 1982, denying its (plaintiff's) motion in docket 134–81C to *add* the very same bad faith and misrepresentation claims defendant now argues were already decided therein. In that order of denial, plaintiff points to the fact that the court denied the motion to amend, not based on a review of the merits of the proposed amendments, but simply on the fact that "plaintiff present[ed] no new facts sufficient to justify in effect reopening the case." *Gregory Lumber Co.,* 230 Ct.Cl. at 1047.

Also related to the merits of plaintiff's case, and pertinent to the propriety of granting defendant's summary judgment motion, is the assertion in plaintiff's opposition brief that defendant's disclaimers of liability are unconscionable and should therefore be stricken from the contract. Once stricken, plaintiff insists, defendant's motion must fall of its own weight. Again, plaintiff relies for these propositions solely on the UCC and various state and federal cases allegedly construing its provisions. Defendant's reply brief addresses the foregoing by arguing that plaintiff's construction of the unconscionability theory is misplaced because the unconscionability provisions of the UCC are *not* intended as an escape from a "bad bargain." Whatever the merits of these arguments, we pause at this posture to note that while plaintiff apparently argued this theory before the IBLA, *see Gregory Lumber Co.,* 54 IBLA 309, 315 (1981), plaintiff's unconscionability argument is nowhere found at any place in its pleadings before this court. However, given the fact that the defendant has not objected to plaintiff's assertion of this claim, we see no reason to not consider it in due course inasmuch as defendant may be said to have waived any objection otherwise available.

Finally, plaintiff makes an attempt to refute defendant's argument that 43 U.S.C. § 1181a (1976) was not intended in any way to protect purchasers of timber from the government. While plaintiff concedes that one purpose of the statute is to protect the government's interest in receiving a fair price, plaintiff also contends that "it is equally true that it [43 U.S.C. § 1181(a)] protects the local industries who buy the timber from being forced to buy timber at excessive prices." Plaintiff's Opposition to Defendant's Motion for Summary Judgment, February 15, 1983, at 24. Plaintiff has not substantively responded to defendant's jurisdictional challenge to this claim at any point in the proceedings.

C. *Plaintiff's Concurrent Motions—(i) R.U.S.C.C. 56(f) and (ii) Stay Rulings on Defendant's Summary Judgment Motion*

In the alternative, and concurrently with its opposition to defendant's motion for summary judgment, plaintiff has also

sought a stay of a ruling on said summary judgment motion pending limited discovery pursuant to R.U.S.C.C. 56(f). Initially, plaintiff's motion pursuant to Rule 56(f) was met with a motion by defendant for a protective order (February 23, 1983). On February 28, 1983, defendant was granted its protective order and plaintiff was denied discovery pursuant to R.U.S.C.C. 56(f), both to be effective until defendant's reply brief in support of its motion for summary judgment was filed on March 18, 1983. That order, of February 28, 1983, stated: "Accordingly, and *without prejudice to the substantive rights of either party*, discovery is hereby stayed for the time being." Order (unpublished), February 28, 1983, at 2 (emphasis added).

At the conclusion of the March 18, 1983 briefing period, the plaintiff again renewed its motion for discovery on June 7, 1985.[12] A status conference was thereafter held on August 15, 1985, at which plaintiff's motion was clarified as being a motion pursuant to R.U.S.C.C. 56(f).[13] At that status hearing, the parties were given full opportunity to argue their respective views for and against any further limited discovery on behalf of the plaintiff.

The respective positions regarding the propriety of granting discovery, pursuant to R.U.S.C.C. 56(f), have remained consistent since the parties' written submissions relative to plaintiff's initial motion. *See supra.* Plaintiff strenuously asserts entitlement under Rule 56(f), alleging that the precise information it needs to properly raise further genuine issues of material fact relative to the bad faith and misrepresentation claims rests exclusively within the possession of the defendant. In this connection, plaintiff refers specifically to information regarding defendant's knowledge, motive, and intent, prior to and at the time of contracting. Relying on cases interpreting F.R.C.P. 56(f), a rule which essentially mirrors R.U.S.C.C. 56(f), plaintiff's position is tantamount to a claim that

to deny it limited discovery under 56(f), and to rule at this posture on defendant's dispositive motion, would be an abuse of discretion amounting to reversible error. *See Costlow v. United States,* 552 F.2d 560 (3d Cir.1977); *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438 (2d Cir. 1980); *Portland Retail, Etc. v. Kaiser Foundation, Etc.,* 662 F.2d 641 (9th Cir. 1981).

By contrast, defendant has at all times vigorously pursued a ruling on the merits of its motion for summary judgment. In addition to its position that even given the existence of bad faith and misrepresentation for purposes of the motion plaintiff cannot prevail, defendant also opposes discovery for three reasons. First, defendant claims plaintiff has already obtained substantial discovery relative to docket 428–80C, much of which yielded information applicable to all of plaintiff's contracts. Second, defendant claims that contrary to plaintiff's characterization, plaintiff has actually had ample time for any discovery it may have required for purposes of defendant's motion. According to defendant, "[i]f the discovery before the IBCA and in the Dunn Ridge case do not make out a sufficient response to summary judgment, plaintiff can blame its own dilatory conduct." Defendant's Reply Brief in Support of its Motion for Summary Judgment, March 18, 1983, at 25. Finally, defendant reiterates its legal position regarding summary judgment and concludes as its third reason that "[f]urthermore, the discovery plaintiff seeks, if allowed, will make no difference to the outcome of the case." *Id.* at 27.

Following the presentation of the parties' positions, plaintiff's motion was again denied, *without prejudice. See* Transcript of Proceedings, September 12, 1985, at 6 (status conference of August 15, 1985 and order of August 16, 1985). At that time, however, the court indicated that any subsequent showing of plaintiff's entitlement

---

**12.** *See* Gregory Lumber Company's Suggestions For Proceeding With The Case, June 7, 1985, at 1.

**13.** *See* Transcript of Proceedings, *Gregory Lumber Co. v. United States,* September 12, 1985, at 3–6 (status conference, August 15, 1985).

to discovery, pending the resolution of defendant's motion, would be favorably considered without delay. In further attempting to resolve the legal ramifications of the parties' positions regarding the alternatives of a Rule 56(f) continuance and a ruling on defendant's motion, the court instructed the parties to restate their positions and supplement their case authority by written memoranda.

It is now upon a meticulous review of the parties' supplemental memoranda filed pursuant to the August 16, 1985 order, a second set of similar supplements filed following a later status conference of September 23, 1985, as well as the entire file that the court acts, in the interest of justice, to vacate its order of August 16, 1985, and to grant plaintiff's motion for limited discovery pursuant to R.U.S.C.C. 56(f). The detailed reasons for this change of opinion are thoroughly outlined hereinafter.

### D. *Summary of Opinion*

Given the scope and complexity of the foregoing, we pause now to state our legal conclusions so as to provide an anticipatory basis upon which the reader may more easily absorb the discussion which follows.

#### (i) *Legal Conclusions Re Jurisdictional Issues*

(a) This court has direct access Contract Disputes Act jurisdiction (§ 609) with respect to six docketed claims (*i.e.*, 428–80C, 532–80C, 626–80C, 627–80C, 628–80C and 637–80C) relative to all claims alleged in said petitions;

(b) CDA direct access jurisdiction is dismissed as to dockets 578–80C, 135–81C, 136–81C, and 137–81C (the predecessor Court of Claims previously dismissed CDA jurisdiction in dockets 134–81C and 146–81C on January 8, 1982, and June 8, 1982);

(c) This court has Tucker Act jurisdiction (28 U.S.C. § 1491) with respect to the remaining claims (578–80C, 134–81C, 135–81C, 136–81C, 137–81C and 146–81C). Said Tucker Act jurisdiction exists:

(1) as direct access *de novo* relative to plaintiff's timber underrun claims based on breach of warranty, bad faith and misrepresentation; and the warranty of rock source claim in docket 146–81C; and

(2) under the Wunderlich Act standard of review relative to those miscellaneous claims in dockets 578–80C (road design change); 134–81C (landslide claim); and 146–81C (road design change).

#### (ii) *Legal Conclusions Re Dispositions*

(a) Defendant's motion for summary judgment, treated as a motion to dismiss, is granted, relative to plaintiff's alleged violation of statute cause of action (43 U.S.C. § 1181a), because of lack of jurisdiction;

(b) Defendant's motion for summary judgment, more in the nature of a motion to dismiss (all dockets except 134–81C), grounded on the premise that this court is without jurisdiction to hear plaintiff's bad faith and misrepresentation claims, because they sound in tort, is denied;

(c) Defendant's motion for summary judgment is stayed (all dockets except 134–81C), relative to the timber underrun claims, based on breach of warranty, bad faith and misrepresentation, to permit appropriate discovery pursuant to R.U.S.C.C. 56(f) according to the schedule listed below;

(d) Defendant's motion for summary judgment, treated as a motion to dismiss, is granted, without prejudice, on jurisdictional grounds, *infra*, relative to plaintiff's road design offset claim in docket 578–80C because it is an "arising under claim" and plaintiff has not exhausted its administrative remedies in that the IBLA has not ruled;

(e) Defendant's motion for summary judgment is stayed pending completion of the discovery schedule listed below, relative to plaintiff's rock source cause of action (*i.e.*, a breach claim) in docket 146–81C;

(f) Defendant's motion for summary judgment, treated as a motion to dismiss, is granted, without prejudice, on jurisdictional grounds, *infra*, relative to the road design change cause of action in docket 146–81C because it is an "arising under claim" and

plaintiff has not exhausted its administrative remedies in that the IBLA has not ruled;

(g) Plaintiff's landslide cause of action (an arising under claim) in docket 134–81C is hereby remanded to the IBLA, pursuant to R.U.S.C.C. 60.1 for a full and fair hearing;

(h) Defendant's motion for summary judgment is stayed pending completion of the discovery schedule listed below, relative to plaintiff's negligent marking of trees cause of action in docket 428–80C;

(i) All proceedings relative to defendant's counterclaim in docket 134–81C are further stayed pending the completion of the discovery schedule listed below; and

(j) Defendant's motion for summary judgment is stayed pending completion of the discovery schedule listed below, relative to plaintiff's warranty of road costs cause of action in docket 532–80C.

(k) Plaintiff is hereby granted R.U.S.C.C. 56(f) discovery, and defendant's protective order is vacated, relative to the entirety of its timber underrun claims. Such discovery shall take place over the following schedule, to be then followed by supplemental briefing as indicated:

(1) Plaintiff shall undertake discovery to April 15, 1986;

(2) Plaintiff shall file a supplemental memorandum in opposition to Defendant's Motion For Summary Judgment by May 5, 1986; and

(3) Defendant shall file a supplement to its Motion For Summary Judgment by May 27, 1986.

II. DISCUSSION—Defendant's Motion for Summary Judgment

A. *Introduction*

The defendant's motion for summary judgment presents for decision a number of inextricably interrelated and complex issues. Ironically, it might be that the articulation of the proper jurisdictional base and

the appropriate standard of review regarding each claim is perhaps more troublesome than it will be in reaching a decision on the substantive merits. That is likely because on the merits there are essentially uniform questions of law, while the jurisdictional and standard of review issues implicit in these twelve cases are a complex mix of Tucker Act and Contract Disputes Act law. In view thereof, we shall proceed ever so cautiously to first delineate the appropriate jurisdictional basis and standard of review for all claims before addressing the merits.

We begin our analysis by observing that there are two distinct jurisdictional categories in which the claims will fall. The first category is the direct access provision of the Contract Disputes Act (CDA). Because direct access jurisdiction to the Claims Court, pursuant to the CDA, embraces claims not previously exposed to an administrative determination at the board level, the standard of review of all such CDA claims in this court is *de novo*. The second jurisdictional category in which claims might fall is under the Tucker Act. Here, as required, for purposes of determining the standard of review before the Claims Court with respect to such claims, we perform the traditional bifurcation of contract claims into either the "breach" or the "arising under" categories.[14] If the claim is in the former category, the contractor has a direct access appeal to this court which is also subject to a *de novo* review. On the other hand, if the claim is in the latter category, following an administrative determination by a board, said claim is subject only to a Wunderlich Act review[15] in this court. Following thereon, we discuss two other alleged jurisdictional issues which have been asserted as a reason to deprive this court of Tucker Act jurisdiction: (a) that plaintiff's misrepresentation and bad faith claims "sound in tort" and are outside the purview of the Tucker Act; and (b) that plaintiff's violation of statute claim based on 43 U.S.C. § 1181a (1976) is

---

**14.** *Edward R. Marden Corporation v. United States,* 442 F.2d 364, 366–67, 194 Ct.Cl. 799 (1971).

**15.** Wunderlich Act, 41 U.S.C. §§ 321–322 (1982).

not actionable because this statute is not one which Congress intended to form the basis of monetary relief in the Claims Court.

**B.** *Jurisdiction and Standard of Review*

**1.** *Contract Disputes Act Direct Access Jurisdiction*

There are six docketed claims that we find, *infra,* qualify jurisdictionally pursuant to the direct access provision of the Contract Disputes Act (CDA, *supra,* § 609). Since plaintiff has indicated a clear desire to avail itself of CDA direct access jurisdiction where it is appropriate, we will find accordingly. Direct access jurisdiction pursuant to the CDA has essentially five prerequisites: (1) the existence of an Executive Agency contract (§ 602(a)); (2) a prior decision on the claim by a contracting officer (§ 605(a)); (3) certification for claims over $50,000 (§ 605(c)(1)); (4) filing a petition in this court within the twelve-month statute of limitations period (§ 609(a)(3)); and (5) for contracts entered into before the effective date of the CDA (March 1, 1979), a claim then pending on the effective date before a contracting officer or initiated thereafter (*see* § 601 note).

As to the first element, in fact all twelve of plaintiff's contracts are Executive Agency Contracts within the meaning of § 602(a)(4). That section, which describes such contracts as those for "the disposal of personal property," was made applicable to timber sale contracts in *Everett Plywood Corp. v. United States,* 651 F.2d 723, 227 Ct.Cl. 415 (1981). In that case, the predecessor Court of Claims expressly held that "a timber contract is the sale of personal property for purposes of federal law and is not an interest in land." *Id.* at 733. Under the rule of *Everett Plywood,* therefore,

each of plaintiff's timber sale contracts is within the intended scope of the CDA.

■ Each of plaintiff's timber underrun claims, *i.e.,* demand for reimbursement for the alleged shortfall, has also been pursued at the contracting officer level.[16] The twelve contracting officer denials were received between November 1978 and November 1979. As for certification of each claim, the record shows that none of plaintiff's initial appeals at the contracting officer level were certified pursuant to § 605(c)(1). This circumstance is not fatal given the precedent in the predecessor Court of Claims' decision in *Folk Construction Co. v. United States,* 226 Ct.Cl. 602 (1981). According to *Folk Construction,* "when a contracting officer renders a decision *after* the effective date of the Act [CDA] on an uncertified claim submitted *prior* to that date, the contractor may proceed under the Act and appeal to this court." *Id.* at 605 (emphasis added). Under this test, eight of plaintiff's claims reflected in dockets numbered 428–80C, 532–80C, 578–80C, 626–80C, 627–80C, 628–80C, 637–80C, and 146–81C, qualify for waiver of the certification requirement pursuant to *Folk.* The remaining four docketed claims, 134–81C, 135–81C, 136–81C and 137–81C, each had contracting officer decisions issued *prior* to the effective date of the CDA, March 1, 1979, and therefore do *not* come within the jurisdictional parameters of the CDA.

■ Of the foregoing eight docketed claims where § 605(c)(1) certification is properly waivable, only six of said claims were timely filed in the predecessor Court of Claims within the CDA twelve-month statute of limitations period (§ 609(a)(3)). This limitation period required filing in the predecessor Court of Claims within twelve

---

**16.** This conclusion holds regardless of the fact that plaintiff has *since* the contracting officer decision asserted alternative *theories* of recovery *not* presented at the contracting officer level. The CDA requires only that the *claim,* the assertion of a right to compensation and the amount, without mention or regard to *theories* of recovery, be presented to the contracting

officer. While neither the CDA nor its legislative history contain a specific definition of the term "claim," we take as authority for our position the consistent interpretation found in both *Fidelity and Deposit Co. of Maryland v. United States,* 2 Cl.Ct. 137, 143–45 (1983), and *Z.A.N. Co. v. United States,* 6 Cl.Ct. 298, 304 (1984).

months of the date a final decision on the claim was received by the contractor from the contracting officer. In claims under docket numbers 428–80C, 532–80C, 626–80C, 627–80C, 628–80C, and 637–80C, said filings in the predecessor Court of Claims were timely made within the twelve-month period provided in § 609(a)(3). However, in docketed claims numbered 578–80C and 146–81C, the petitions were filed *beyond* twelve months from the contracting officer's final decision. For that reason, CDA direct access jurisdiction is, therefore, foreclosed to these latter two claims.

The final criterion, which all six remaining dockets fulfill, is that for contracts entered into *before* the effective date of the CDA (March 1, 1979), the initial claim must have been *pending* before the contracting officer on March 1, 1979, or *initiated* thereafter. All twelve contracts were entered into *before* March 1, 1979. Moreover, as for the six docketed claims which we find qualify under the CDA (428–80C, 532–80C, 626–80C, 627–80C, 628–80C and 637–80C), all were either pending before a contracting officer on the effective date of the CDA, March 1, 1979, or were initiated thereafter. This is so because each of the foregoing claims was the subject of a contracting officer's decision between August and November 1979. *See* Appendix A.

In sum, then, since these six docketed claims fulfill all requirements necessary to fix direct access jurisdiction in this court under the CDA, we honor plaintiff's inclination to proceed under the CDA and hereby find CDA direct access jurisdiction to be proper as to the following dockets: Nos. 428–80C, 532–80C, 626–80C, 627–80C, 628–80C and 637–80C. As for the remaining dockets, CDA direct access jurisdiction is hereby dismissed in Nos. 578–80C, 135–81C, 136–81C and 137–81C. Finally, as previously noted, CDA direct access jurisdiction was previously dismissed by the Court of Claims as to docket nos. 134–81C and 146–81C in *Gregory Lumber Co.*, 229 Ct.Cl. at 762 (January 8, 1982), and *Gregory Lumber Co.*, 231 Ct.Cl. at 712 (June 8, 1982), respectively.

■ Having found CDA direct access jurisdiction in this court as to the foregoing six docketed claims, the next determination involves the appropriate standard of review as to each claim contained therein. That determination is without controversy for the reason that the CDA itself provides that for direct access appeals, the standard of review is one of a "proceed[ing] de novo in accordance with the rules of the appropriate court." 41 U.S.C. § 609(a)(3). In other words, contrary to non-CDA jurisdiction as discussed *infra*, there is no threshold inquiry seeking to designate claims as either "breach claims" or "arising under claims" in order to sort out jurisdiction and the appropriate standard of review. Under CDA direct access jurisdiction, the disputes clause procedure is, essentially, ignored to the extent it may have required certain claims to be tried *de novo administratively*. Therefore, for those docketed claims properly within this court's CDA direct access jurisdiction, no fragmentation of remedies can occur, in that no exhaustion of administrative remedies is required—consequently, all claims, in each CDA docket, are reviewed *de novo* regardless of their ability to be otherwise formally cognizable under the contract.

2. *Tucker Act Jurisdiction—*
 *—Arising Under Claim—Wunderlich Act*
 *—Breach Claim—Direct Access*

In addition to the direct access provision of the CDA, certain contract claims also come within this court's primary jurisdictional statute, 28 U.S.C. § 1491, better known as the Tucker Act. Such claims, depending on their threshold characterization, *i.e.*, "breach claims" or "arising under claims," *infra*, are reviewable here either on a direct access *de novo* basis or on an exhaustion of administrative remedies Wunderlich Act standard of review, respectively. While having failed to qualify under CDA direct access jurisdiction, most of the claims in the remaining dockets, 578–80C, 134–81C, 135–81C, 136–81C, 137–81C and 146–81C, are nonetheless

properly cognizable for direct access *de novo* review in this court under the Tucker Act.

■ Normally, when faced with Tucker Act (as distinguished from CDA) contract disputes cases, the initial jurisdictional inquiry concerns whether a particular cause of action is a claim "arising under" the contract, or is a "breach claim." *See Monroe Garment Co., Inc. v. United States,* 488 F.2d 989, 203 Ct.Cl. 324 (1973). This esoterical distinction, at the threshold, determines both the *path* to and the *scope* of judicial review in the Claims Court. If the claim is one "arising under the contract," [17] the contractor is normally bound by the contract's disputes clause to exhaust all administrative remedies *first* before petitioning here under the standards of the Wunderlich Act, 41 U.S.C. §§ 321–322 (1982). In such case, judicial review is strictly limited to the record established before the administrative board. *See, e.g., United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 402, 86 S.Ct. 1545, 1550, 16 L.Ed.2d 642 (1966); *Morrison-Knudsen Co. v. United States,* 345 F.2d 833, 837, 170 Ct.Cl. 757 (1965); *Zidell Explorations, Inc. v. United States,* 427 F.2d 735, 192 Ct.Cl. 331 (1970). On the other hand, if the relief sought is one premised on a "breach claim," [18] direct access to the Claims Court is automatically permitted. *See, e.g., Edward R. Marden Corp.,* 442 F.2d at 367; *Len Co. & Assoc. v. United States,* 385 F.2d 438, 181 Ct.Cl. 29 (1967); *Specialty Assembly & Packing Co., Inc. v. United States,* 355 F.2d 554, 174 Ct.Cl. 153 (1966).

■ The "breach" versus "arising under" controversy has evolved because both the Supreme Court, and the predecessor Court of Claims, have held that contracting parties have the power to provide in the contract that certain claims for breach shall be deemed reviewable administratively, and that certain claims shall not. *Utah Construction & Mining Co.,* 384 U.S. at 394, 86 S.Ct. at 1545; *Len Co. & Assoc.,* 385 F.2d at 441; *Monroe Garment Co., Inc.,* 488 F.2d at 996. While both categories of claims are literally for breach of contract, over time the fictive dichotomy "claims arising under" versus "claims for breach," has evolved and been adopted by the courts to describe an *administratively* versus a *judicially* cognizable claim at first instance. *See id.* At the heart of this distinction, however, and central to properly categorizing each claim presented, is the precise language of the contract term purporting to convert a particular breach claim to one cognizable as arising under the contract. As the Court of Claims stated in *Len Co. & Assoc.,* 385 F.2d at 444, "[c]ategorization of the claim—'arising under' the contract, or breach of contract—*depends upon the particular clause, its words and intent* (emphasis added)."

While to some a matter of great controversy, the words "claim arising under the contract" mean very much what they say. On point is *Zidell Explorations, Inc., supra,* in which the Court of Claims held that a claim *arises under the contract* when there is a specific contractual clause through which the contractor can get "all the relief to which it is entitled and asks." *Zidell,* 427 F.2d at 737 (emphasis added). Various types of clauses can qualify. Appropriate administrative remedies have been recognized to exist in such clauses styled as the *standard* "Changes," "Changed Conditions," or "Inspection" clauses. *See Len Co. & Assoc.,* 385 F.2d at 442–50.

■ Conversely, where *complete* relief has *not* been made available under the contract, there remains the judicially cogni-

---

**17.** A claim is perceived to "arise under the contract" "to the extent complete relief is available under a specific provision of the contract...." *Edward R. Marden Corp.,* 442 F.2d at 366–67.

**18.** A breach claim exists "to the extent complete relief is *not* made available under a specific contract provision [in such case] a controversy is not subject to administrative determination via the Disputes clause and may be tried *de novo*...." *Edward R. Marden Corp.,* 442 F.2d at 367.

zable pure "breach [of contract] claim." A breach claim is one, in general, where relief cannot by reasonable interpretation be granted in the form of an equitable adjustment or constructive change pursuant to any appropriate clause of the contract. For example, in a specifications context, the change is often said to be "cardinal" or beyond the scope of the contract under the changes article. Such a change would be one which fundamentally alters the contractual undertaking of the contractor. This principle is more fully developed in the case of *Edward R. Marden Corp.*, 442 F.2d at 364. Therein, *Marden* affirms the narrow reading of adjustment clauses to allow arising under claims only where an adjustment provision "authorize[s] the granting of a specific type of relief." *Edward R. Marden Corp.*, 442 F.2d at 368, *quoting Len Co. & Assoc. v. United States*, 385 F.2d at 451. Absent such an adjustment provision, however, while the clause may "specify what the rights and obligations of the parties are ...," a *de novo* judicial proceeding is still required as an administrative board would be without jurisdiction to then "fashion an affirmative remedy for [the] plaintiff...." *Id.*

Similar, and with equal support, is the Supreme Court's pronouncement in *Utah Construction & Mining Co.*, 384 U.S. at 394, 86 S.Ct. at 1545. *Utah* explains that breach claims derive in the absence of "specific adjustment provisions contemplating relief under the contract...." *Id.* at 413, 86 S.Ct. at 1555. In short, we construe *Utah* and *Marden* together and derive the rule that a trial *de novo* may be granted even though the claim arises out of a contractual provision which specifies the aggrieved parties' contractual rights and obligations, so long as that provision, by its own terms, does *not* also simultaneously authorize the relief being sought.

Against this background we now proceed to apply the standards delineated, *supra,* to ascertain which of the foregoing Tucker Act jurisdictional bases (arising under or breach) is proper and the appropriate standard of judicial review for each of plaintiff's claims in those dockets where relief *must* be sought, if at all, under the Tucker Act (578–80C, 134–81C, 135–81C, 136–81C, 137–81C and 146–81C). The discussion which follows embraces (1) the timber underrun *claim* under three different theories advanced by plaintiff, *i.e.,* (a) the original breach of warranty theory based on the shortfall in the contract estimates (original petition count one); (b) a misrepresentation theory alleging that defendant knowingly misrepresented the amount of recoverable timber to induce plaintiff to enter into the contracts (amended petition count seven); and (c) a bad faith theory to the effect that defendant intentionally induced plaintiff to enter into the contracts with false estimates of recoverable timber (amended petition count six); and (2) various performance claims in dockets: (a) 578–80C, a claim for a road design change offset; (b) 134–81C, a claim for added expense due to the effects of a landslide; and (c) 146–81C, a claim based on defendant's breach of an alleged warranty of rock source and a claim for a road design change offset.

a. *The Timber Underrun Claims— Tucker Act Jurisdictional Basis*

(1) *"Original" Breach of Warranty Theory*

Plaintiff's breach of warranty theory, the focus of its timber underrun claim set forth in its original petition, seeks recovery from the government for its failure to provide plaintiff with recovered timber in amounts closely approximating defendant's estimates in the contract. Thus, plaintiff asserts the existence of an express warranty by the defendant, as a matter of law, to the extent of the contract estimates and also contends that said warranty was breached as a result of the actual timber shortfall. This claim exists before the court in Tucker Act dockets 578–80C, 135–81C, 136–81C, 137–81C and 146–81C. The issue necessarily arises, in view of our discussion, *supra,* whether plaintiff is entitled to a trial *de novo* because said claims are "breach claims," or do Wunderlich Act rules of lim-

ited review apply (because they are arising under claims).

Viewing the identical language in the foregoing five contracts under the standards articulated *supra*, it is patently clear that no part of the contracts, expressly or by implication, contains specific adjustment provisions aimed at remedying *recoverable timber shortfalls* of any kind. That is not to say, however, that no changes or adjustment clauses exist in plaintiff's contracts. On the contrary, in terms of adjustment and/or changes clauses, plaintiff's contracts contain four specially-drawn clauses related to timber quality and price adjustments,[19] and two specially-drawn clauses relative to road design and physical conditions changes.[20] In fact, each of the timber related adjustment clauses identifies its *unique* applicability and scope in far more *particularized* language than that which would encompass an equitable adjustment of the broad magnitude sought by plaintiff.

Perhaps the only clause even remotely and arguably relevant to providing timber relief under a contract provision is Section 8, which is captioned "Sales of Additional Timber." This clause allows the parties to agree to extend the contract's coverage to *additional* standing timber in exchange for *additional* consideration by the contractor. For example, the "[p]urchaser shall pay for such timber at a price determined by the Authorized Officer in accordance with the Bureau of Land Management prescribed procedures." Contract for the Sale of Timber No. 0R090–TS–7–21, March 14, 1977, at 2, Sec. 8. The language of Section 8 addresses only "Additional" timber, thus clearly implying timber not already a part of the initial contract consideration. Critical to this clause is the distinctive fact that

it is also very specific on the requirement that additional consideration "shall" be paid for said additional timber. Plaintiff, on the contrary, seeks relief by enforcing a warranty for the provision of timber it contends is *already* included in the contracts for which it had already paid a monetary consideration. Given the substance of plaintiff's claims, *supra*, to construe Section 8 as providing complete relief at the board level therefor would, in our judgment, require a tortious manipulation of the language therein, which would truly be *ultra vires* the contract.

▌ Consequently, absent the existence of an express contractual provision affording plaintiff complete relief for the injury alleged, we find that the breach of warranty claim proffered can only be termed a pure "breach claim." As such, it is now outside of the jurisdiction of the administrative process, and as a consequence surfaces under this court's direct access Tucker Act jurisdiction. As that jurisdictional authority implies, the standard of review is *de novo*. Pertinent to our conclusion that these claims do *not* arise under the contract, but are clearly "breach claims," is the concomitant effect on the IBLA's decisions. Since we find said claims to be clearly "breach claims," this circumstance voids the jurisdiction and authority of the prior IBLA disposition on the merits of the breach of warranty claims in docket nos. 135–81C, 136–81C and 137–81C. *See* Appendix A. To the extent any facts found by the IBLA relative to *this claim* were to have been final and binding pursuant to the contract disputes procedure, such facts are no longer binding for purposes of defendant's motion in this court.[21] *Utah Con-*

---

**19.** These contract sections are numbers 7, 8, 9, and 11.

**20.** These contract sections are numbers 19 and 20.

**21.** Moreover, we note two other important implications of our voiding the IBLA determination of plaintiff's breach of warranty claims: (1) to the extent plaintiff has alleged prejudice because of alleged due process violations by the

IBLA in reaching those now voided decisions relative to the breach of warranty claim, that issue is now moot; and (2) to the extent any facts found pursuant to other claims *within* the IBLA's jurisdiction in these dockets *overlap* with or impact upon those relevant for *our* breach of warranty analysis, they shall be carried forward and considered binding on both parties consistent with the Supreme Court's pronouncement in *Utah Construction & Mining Co.,* 384 U.S. at 418–23, 86 S.Ct. at 1558–60.

*struction & Mining Co.*, 384 U.S. at 412, 86 S.Ct. at 1555.

**(2) *Plaintiff's Bad Faith and Misrepresentation Theories***

As previously stated, the remaining two theories upon which plaintiff seeks recovery, grounded upon the alleged timber underruns, are premised on claims alleging bad faith and misrepresentation in the inducement. While stated as separate counts in plaintiff's petitions, the substantive conduct which is averred as the basis of these claims is identical and will, therefore, be jointly discussed herein. In essence, plaintiff charges defendant with either actual or constructive knowledge regarding the falsity of the estimates in its contracts, and the knowing use of such knowledge to induce an otherwise uninformed plaintiff to enter into the subject contracts.

In relation to those Tucker Act dockets undergoing jurisdictional analysis herein, these two claims also exist in dockets 578–80C, 135–81C, 136–81C, 137–81C and 146–81C. As for the remaining Tucker Act docket, 134–81C, these two claims are *not* before this court due to the Court of Claims' ruling in *Gregory Lumber Co.*, 230 Ct.Cl. at 1047 (Ct.Cl. No. 134–81C, July 23, 1982). That ruling denied plaintiff's motion to amend its petition (134–81C) to include both the misrepresentation and bad faith claims. *Id.* The denial of plaintiff's motion to amend as to this docket was based on the court's view that given the previous decision on the merits in docket 134–81C (*see Gregory Lumber Co.*, 230 Ct.Cl. at 1041, Ct.Cl. No. 134–81C, June 4, 1982), plaintiff in its motion to amend had failed to "present ... new facts sufficient to justify in effect reopening the case." *Gregory Lumber Co.*, 230 Ct.Cl. at 1047.

■ Our single inquiry for purposes of deciding the proper jurisdictional basis and standard of review for these claims in the foregoing five dockets is their proper categorization as either "breach claims" or "arising under claims." As was the case with plaintiff's breach of warranty theory, these two additional theories for recovery

based on the timber underrun claim (*i.e.*, bad faith and misrepresentation) are also cognizable in this court *only* as "breach claims." This we are constrained to find because in no clause of plaintiff's five contracts is any attempt made to define a remedy for the failure of a party to have acted in good faith. Therefore, as "breach claims," and as was similarly decided for the breach of warranty claims, as well as those dockets here pursuant to the CDA, the standard of review for the bad faith and misrepresentation theories in docket numbers 578–80C, 135–81C, 136–81C, 137–81C and 146–81C is *de novo.*

**b. *Miscellaneous Performance Claims***

**(1) *Docket 578–80C: Road Design Change Offset***

■ In paragraph 30 of plaintiff's third amendment to its petition, docket 578–80C, plaintiff asserts that certain savings produced pursuant to a mutually agreed upon road design change were not properly credited to reduce plaintiff's overall road usage charge. For purposes of Tucker Act contract disputes jurisdiction, this claim is undoubtedly one which is cognizable under Section 20 of plaintiff's contracts as "arising under the contract." Section 20 provides:

> Sec. 20. Design Change—If Purchaser and the Authorized Officer agree on a design change of a substantial nature in any road, road structure, or bridge required to be constructed or improved under the terms of this contract, the total purchase price shall be revised to reflect the estimated increase or decrease in cost resulting from such design change. A design change of substantial nature is one that would result in a cost adjustment of $1,000 or more.

That plaintiff's contracting officer refused to make the precise adjustment called for by Section 20 is surely a matter within the power of the IBLA to review, reverse or affirm. Thereafter, if there is still dissatisfaction with the decision of the IBLA, an appeal may then be had to this court pursu-

ant to the standards of the Wunderlich Act. As stated in *Zidell Explorations,* such a clause as Section 20, *supra,* provides plaintiff with "all the relief to which it is entitled and asks." *Zidell Explorations,* 427 F.2d at 737.

■ Having found plaintiff's road design change claim to be one technically cognizable as arising under Section 20 of plaintiff's contract, the presentation of that claim at the administrative level, and an exhaustion of all administrative remedies prior to suit in this court would normally be required. *See Zidell Explorations, supra.* However, notwithstanding the foregoing, while *not* raised pursuant to defendant's *current* motion for summary judgment, our review of the earlier proceedings in this case reveals that at one time plaintiff objected to the administrative review of such claims because the disputes clauses in its contracts were "permissive" and not "mandatory." Said argument by plaintiff would have *this* court try all claims under the Tucker Act as "breach claims" entitled to direct access *de novo* review regardless of whether they are "arising under claims." For the record, as discussed *infra,* we disagree with said conclusion and dismiss plaintiff's road design change offset claim, without prejudice, for lack of jurisdiction in that administrative remedies have not been exhausted because the IBLA has not ruled.

In Section 37 of each of plaintiff's contracts, it states as follows: "Appeal—An appeal may be taken from any decision of any officer of the Bureau of Land Management to the Board of Land Appeals pursuant to the Rules of Practice (43 C.F.R. Part 4, Subpart E)." Given this clause, we interpret plaintiff's previous objection to be that the appeal to the board is permissive and not mandatory, and may be bypassed

by appealing the contracting officer's decision directly to this court. Even though not a standard disputes clause, we read the words "may appeal" to refer to the permissive nature of the *appeal itself,* rather than that the *use* of the board for an intended appeal is discretionary. Under this construction, our reading of section 37 is that plaintiff *may,* but *need not* appeal—but if it does, it *must* appeal to the Board of Land Appeals.

This preferred mandatory interpretation is supported most persuasively by recourse to the regulations cited to and incorporated by reference into section 37. Quite specifically, in relation to appeals from decisions of contracting officers, 43 C.F.R. § 4.21(b) (1974) states that "[n]o decision which at the time of its rendition is subject to appeal to the Director or an Appeals Board shall be considered final so as to be agency action subject to judicial review...." Clearly, plaintiff is seeking judicial review of the decision of a contracting officer, which decision this regulation *deprives* of the necessary finality *prior* to a final decision by the agency Board of Land Appeals. Thus, jurisdictionally speaking, this regulation, in conjunction with the appeals clause (Section 37), makes the contracting officer's decision *unreviewable* by any court prior to its being passed on by the voice which the government has sanctioned to speak in a binding way for the Department of the Interior—the IBLA.[22] Any other conclusion is wholly inconsistent with 43 C.F.R. § 4.21(b) (1974).

■ In addition, it is important to recognize that the policy behind the doctrine of exhaustion of administrative remedies argues strongly against any construction of nonstandard disputes clauses as

---

**22.** Also instructive relative to the finality issue is 43 C.F.R. § 4.1 (1974, 1975, 1976) which states:

The Office of Hearings and Appeals, headed by a Director, is an authorized representative of the Secretary for the purpose of hearing, considering and determining, as fully and finally as might the Secretary, matters within the jurisdiction of the Department involving hearings, and appeals and other review functions of the Secretary. Principal components

of the Office include ... (b) Appeals Boards, shown below, with administrative jurisdiction and special procedural rules as indicated.

\* \* \* \* \* \*

(3) *Board of Land Appeals.* The Board decides finally for the Department appeals to the head of the Department from decisions rendered by Departmental officials relating to the use and disposition of public lands and their resources....

permissive in nature. In each of the more pointed exhaustion doctrine cases, the reasoning of the court is based on important judicially-sanctioned principles. The most important of these is that exhaustion of administrative remedies is also a *judicial doctrine* which is interrelated with the integrity of the administrative process. It depends for its vitality *not* merely on the "plain language" mandate of whether a disputes clause or statute contains the word "may" or "shall." The Supreme Court has made this clear in the statutory context as long ago as 1968 when it explained in the case of *McKart v. United States,* 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 that:

> The reasons for making such procedures exclusive, and for the judicial application of the exhaustion doctrine *in cases where the statutory requirement of exclusivity is not so explicit,* are not difficult to understand. A primary purpose is, of course, the avoidance of premature interruption of the administrative process. The agency, like a trial court, is created for the purpose of applying a statute in the first instance. Accordingly, it is normally desirable to let the agency develop the necessary factual background upon which decisions should be based. And since agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise. And of course it is generally more efficient for the administrative process to go forward without interruption than it is to permit the parties to seek aid from the courts at various intermediate stages. The very same reasons lie behind judicial rules sharply limiting interlocutory appeals.
>
> . . . .
>
> Certain very practical notions of judicial efficiency come into play as well. A complaining party may be successful in vindicating his rights in the administrative process. If he is required to pursue his administrative remedies, the courts may never have to intervene. And notions of administrative autonomy require that the agency be given a chance to discover and correct its own errors. Finally, it is possible that frequent and deliberate flouting of administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures.

*Id.* at 193–95, 89 S.Ct. at 1662–63 (emphasis added). We feel strongly that there are no barriers to transposing these reasons for mandating administrative review in cases of arguably ambiguous statutes onto cases where the requirement of administrative review is arguably ambiguous pursuant to a government contract clause or the administrative regulations incorporated therein. We find such an analogy appropriate here, in supporting our conclusion that the subject disputes procedure is mandatory, because the language of the regulations herein is far more illuminating regarding exhaustion than that of the statute in *McKart. See McKart,* 395 U.S. at 197, 89 S.Ct. at 1664. *Accord, Wilmot v. United States,* 205 Ct.Cl. 666, 679–81 (1974); *Martilla v. United States,* 118 Ct.Cl. 177 (1950).

In sum then, we find that plaintiff's refund claim in docket 578–80C relative to the road design change is clearly cognizable administratively as an "arising under claim." As such, it is a claim only within the disputes jurisdiction, at *first* instance, of the IBLA. Said board has not issued an administrative decision. Given our findings regarding this claim as an arising under claim, jurisdiction *de novo* in this court is found lacking, and plaintiff's road design change claim in this docket is hereby dismissed, without prejudice, to return, if at all, after an exhaustion of administrative remedies.

(2) *Docket 134–81C: Additional Road Usage Costs Due To Landslide* [23]

In its original petition, docket 134–81C, paragraph 11, plaintiff seeks the refund of

---

**23.** We reach this claim by *sua sponte* lifting the

current stay of proceedings so as to respond to

costs related to road usage not contemplated by the original contract, but incurred as a result of a landslide. The landslide apparently necessitated plaintiff in having to use alternative or more costly routes. This performance claim was one which was before the Court of Claims in the earlier decision on the merits of this docket in 230 Ct.Cl. at 1041, 1045–46. While defendant sought summary judgment in its favor on this issue, the court instead chose to remand the claim to the trial division, now this court. *Id.* at 1045–46. In that remand, the instructions were that the claim should first be categorized as a "breach claim" or an "arising under claim" in order to determine the proper jurisdictional basis and standard of review. Pursuant to either option, the court gave the additional advice that:

> If this issue is to be decided de novo by the court, then the trial division would be justified in recommending, should it choose to do so, that summary judgment be entered against plaintiff.
>
> However, the matter is far more confused if the applicable review is under the Wunderlich Act.
>
> . . . .
>
> [W]e are concerned that plaintiff did not have sufficient opportunity to present its case *before the board*. As we discovered in defendant's first motion for summary judgment, the board's action was stayed on February 6, 1979, after appeal documents had been filed but before plaintiff's request for an oral hearing had been acted upon. Then, after action by plaintiff before other agencies and this court, the board *sua sponte* dissolved its stay and issued the order quoted above. The board denied in that decision plaintiff's request for an oral hearing before an administrative law judge. If Wunderlich Act review applies, the trial division should consider whether plaintiff was precluded from presenting evidence beyond its conclusory allegations of design defect. The trial division should then recommend the action it

deems appropriate—remand, affirmance, reversal—based on its findings.

*Gregory Lumber Co.,* 230 Ct.Cl. at 1045–46 (footnotes omitted).

Following the instructions of the predecessor Court of Claims, our initial determination is that this claim is fully cognizable under Section 19 of plaintiff's contract as a claim arising under the contract. Wunderlich Act review in this court, therefore, applies. As for the Court of Claims' grave concerns regarding potential due process violations by the IBLA in moving to its adverse decision against plaintiff without notice, a hearing, or the opportunity for the presentation of evidence, we also firmly embrace the same misgivings as does the predecessor court. While the rules of the IBLA do not specifically mandate a notice, hearing, or the presentation of evidence, we believe that fundamental fairness contemplates the applicability of such prudential safeguards. In fact, we stress the necessity for such minimum procedure particularly at the board level where, as here, such opportunities were requested by plaintiff *well before* any decision was made.

We do not speculate, at this posture, as to what will be the probative value or relevance as to that which plaintiff might adduce at a hearing before the IBLA in furtherance of its cause; however, we see no reason that the same implied considerations of fundamental fairness that have been viewed as shaping our rules (*see Thoen v. United States,* 765 F.2d 1110 (Fed.Cir. 1985)), and the FRCP (*see Davis v. Howard,* 561 F.2d 565 (5th Cir.1977); *Winbourne v. Eastern Airlines, Inc.,* 632 F.2d 219, 224 (2d Cir.1980)), should not also obtain as to the procedures of the administrative boards. As was succinctly summarized by the Federal Circuit in *Selva & Sons, Inc. v. Nina Footwear, Inc.,* 705 F.2d 1316 (Fed.Cir.1983):

> The concepts of notice, admissibility, and opportunity to be heard are ancient primaries. * * * However correct the conclusion below may be in the end, we

the order of the predecessor Court of Claims on remand issued in 230 Ct.Cl. at 1041.

cannot allow the shaving of principles for expediency when those precepts assure order and justice.

*Id.* at 1322, *quoting Davis*, 561 F.2d at 571–72.

Therefore, while we accept jurisdiction over this claim under the Wunderlich Act, we pause before such review to remand this cause for a *full* hearing, including the presentation of evidence, before the IBLA. *See* R.U.S.C.C. 60.1.

(3) *Docket 146–81C: (a) Warranty of Rock Source Claim and (b) Road Design Change Claim*

(a) *Warranty of Rock Source Claim*

 The first claim averred in paragraph 17 of plaintiff's second amendment to its petition in docket 146–81C alleges that defendant provided an inadequate supply of rock from a faulty quarry for the construction of roads required under the contract. Essentially this is an implied-in-fact warranty type contract claim in which plaintiff claims the recovery of added costs because defendant failed to make available the type and quality of rock it allegedly warranted it would under the contract. The excess costs are incurred from plaintiff allegedly having to do additional work to make a second, alternative rock source usable. There is no changes or adjustment clause in plaintiff's contract which would provide the IBLA the power to remedy an alleged faulty rock source. Because of such absence, we find this to be a breach claim of an implied-in-fact warranty. As such, it is properly here within this court's Tucker Act trial *de novo* jurisdiction. At this posture, however, in order to facilitate an orderly resolution of these cases, we stay any further decision on the merits of this claim pending the completion of the plaintiff's discovery pursuant to R.U.S.C.C. 56(f). *See infra.*

(b) *Road Design Change Claim*

 The second claim found within paragraph 17 of the second amendment to plaintiff's petition, dockets 134–81C and 146–81C, alleges that a contracting officer made design changes in roads which cost plaintiff more than it would have had the roads been built to the original specifications. As was the case regarding the similar claim in docket 578–80C, for purposes of Tucker Act contract disputes jurisdiction, this claim is one which is cognizable under Section 20 of plaintiff's contracts as arising under the contract. The IBLA has never issued a decision on the claim. Plaintiff must therefore first obtain an IBLA decision before appealing here for Wunderlich Act review. Plaintiff's road design change claim is therefore dismissed, without prejudice, for lack of jurisdiction, to return, if at all, after a decision before the IBLA.

c. *Defendant's Counterclaims: Docket 134–81C*

Defendant makes a rather detailed counterclaim in its answer to plaintiff's petition in docket 134–81C. Therein, defendant asserts several breach of contract counterclaims seeking damages for (a) plaintiff's alleged failure to dispose of slash on clear cut areas 3, 4, 5 and 7 as required by Section 15 of the contract; (b) plaintiff's alleged failure to remove all logging debris from streams in clear cut areas 1, 2 and 3 as required by Section 41(b)(3)4 of the contract; and (c) plaintiff's alleged failure to maintain all fire trails on clear cut areas 3, 4, 5 and 7 as required by Section 41(d)(2)3 of the contract. Defendant's counterclaims, which are compulsory under R.U.S.C.C. 13(a), are not included in defendant's pending motion for summary judgment, nor were they addressed as part of the defendant's earlier motion decided at 230 Ct.Cl. at 1041 (Ct.Cl. No. 134–81C, June 4, 1982). Inasmuch as all proceedings are currently stayed in docket 134–81C (save for our jurisdiction analysis of plaintiff's landslide claim discussed *supra* ), we hold that stay effective for all further proceedings in this docket pending the completion of plaintiff's discovery pursuant to R.U.S. C.C. 56(f). *See infra.*

d. *Claims Sounding In Tort: Bad Faith and Misrepresentation in the Inducement*

 As an additional jurisdictional challenge to plaintiff's case, defendant has asserted that plaintiff's bad faith and misrepresentation in the inducement claims are beyond the scope of the Tucker Act as claims "sounding in tort." The Tucker Act grants this court jurisdiction over claims based on express contracts with the government "in cases *not* sounding in tort." 28 U.S.C. § 1491(a)(1) (1982) (emphasis added). Defendant cites essentially to three cases to support its position: *Somali Development Bank v. United States,* 508 F.2d 817, 205 Ct.Cl. 741 (1974); *Aetna Casualty & Surety Co. v. United States,* 655 F.2d 1047, 228 Ct.Cl. 146 (1981); and *Qualls v. United States,* 678 F.2d 190, 230 Ct.Cl. 534 (1982). Through the cases cited, *supra,* defendant also relies on the Supreme Court case of *United States v. Neustadt,* 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961), in which a claim for "wrongful inducement" was held to be one sounding in tort for purposes of the Federal Tort Claims Act.

Plaintiff fails to effectively respond to this procedural challenge. Nonetheless, we are not convinced of the correctness of defendant's otherwise bland conclusory statements. This is so because we find defendant's cases readily distinguishable and out of touch with settled principles regarding the contract jurisdiction of this court. Defendant's motion for summary judgment (more accurately a motion to dismiss), to the extent it challenges this court's Tucker Act jurisdiction over plaintiff's bad faith and misrepresentation claims as ones sounding in tort, is, for the reasons discussed *infra,* denied.

 Under long-standing precedent, suits against the United States in this court must be based upon the sovereign's own waiver of immunity and consent to be sued. *See United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980); *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976); *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941). Such waivers must be unequivocally express, as in the form of a statute which mandates compensation by the government, and may not be implied. *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969); *Soriano v. United States,* 352 U.S. 270, 276, 77 S.Ct. 269, 273, 1 L.Ed.2d 306 (1957). Similarly, any such waiver must be kept to its precise intendment and necessarily strictly construed. *See, e.g., Schillinger v. United States,* 155 U.S. 163, 167–69, 15 S.Ct. 85, 86–87, 39 L.Ed. 108 (1894); *Minnesota v. United States,* 305 U.S. 382, 388–89, 59 S.Ct. 292, 295–96, 83 L.Ed. 235 (1939). While we hold the above foremost in our minds as we decide this issue, we also find it unthinkable that Congress did not also intend the logical converse, *i.e.,* precise waivers of sovereign immunity must be strictly *enforced against* the government as well.

 As stated *supra,* our jurisdictional statute, the Tucker Act, contemplates jurisdiction in this court for claims against the United States arising out of any express or implied-in-fact contract with the government, so long as the "case" itself is not one solely "sounding in tort." *See* 28 U.S.C. § 1491 (1982). In deciding what does or does not constitute the forbidden "sounding in tort" category, the court is directed to "look to the substance of plaintiff's claim rather than to the terminology or characterization used by defendant...." *South Louisiana Grain Services v. United States,* 1 Cl.Ct. 281, 288 (1982).

 What we have here perhaps may be best characterized, because it is most often employed by the courts, as a "tortious breach of contract." On the facts here, the consistent majority of cases, but not the entirety, view such a claim as a contractual violation relying on the parties *privity of contract* as the underlying source of obligation, rather than the duty implied in tort. Generally, these courts hold that "where an enforceable contract [is] alleged, an action for breach [is] not

without the bounds of the Tucker Act simply because elements of tort [are] present in the claim." *Burtt v. United States*, 176 Ct.Cl. 310, 314 (1966). This long-standing reasoning has been used time and again to support the proposition that "a tortious breach of contract is not a tort independent of the contract so as to preclude an action under the Tucker Act." *Id.; accord Chain Belt Co. v. United States*, 115 F.Supp. 701, 711–12, 127 Ct.Cl. 38 (1953); *Fort Sill Gardens, Inc. v. United States*, 355 F.2d 636, 637–38, 174 Ct.Cl. 86 (1966); *Bird & Sons, Inc. v. United States*, 420 F.2d 1051, 1054, 190 Ct.Cl. 426 (1970); *Florida Keys Aqueduct Authority v. United States*, 231 Ct.Cl. 911, 912 (1982). For purposes of our analysis herein, therefore, a tortious breach of contract styled as a misrepresentation in the *inducement* (before the contract is formally signed) does *not* fall outside of this court's Tucker Act jurisdiction. *See, e.g., Summit Timber Co. v. United States*, 677 F.2d 852, 856–57, 230 Ct.Cl. 434 (1982); *Florida Keys Aqueduct Authority*, 231 Ct.Cl. at 912; *Chris Berg, Inc. v. United States*, 404 F.2d 364, 186 Ct.Cl. 389 (1968).

While defendant cites precedent from the predecessor court in an attempt to characterize plaintiff's claims of bad faith and misrepresentation as claims clearly sounding in tort, the settled interpretation of our contract jurisdiction manifested by the holding in *Summit, Florida Keys,* and *Chris Berg, supra,* conclusively establishes that plaintiff has alleged a viable "tortious breach of contract" claim. In other words, regardless of the pre-contract, pre-award stage as of which the alleged inducements (the faulty estimates) were made, an action for *breach of contract* based on such inducements nonetheless lies. *Florida Keys Aqueduct Authority*, 231 Ct.Cl. at 912; *Summit Timber Co.*, 677 F.2d at 856–57. Stated another way, the fact that no contract existed at the time the allegedly false estimates were prepared and used is no defense to plaintiff's proper characterization of this claim as one for breach of contract. As the court in *Florida Keys Aqueduct Authority* stated, "[w]e have

frequently allowed recovery to claimants alleging that they entered into a contract in reliance on government misrepresentation *at its preaward state.*" *Florida Keys Aqueduct Authority*, 231 Ct.Cl. at 912 (emphasis added).

The fact that there are tort aspects to a misrepresentation claim, as is plaintiff's, is too clear to dispute. However, a conclusion that there are tort aspects to plaintiff's claims is not the end of the analysis. What defendant fails to discern is that in addition to the above definition the following is also pertinent:

> where an alleged "negligent" act [also] constitutes a breach of a *contractually* created duty, the Tucker Act does not preclude relief. "[A]n action may be maintained in this court which arises primarily from a contractual undertaking regardless of the fact that the loss resulted from the negligent manner in which defendant *performed* plaintiff's contract."

*Bird & Sons, Inc.,* 420 F.2d at 1054, *quoting Chain Belt Co.,* 115 F.Supp. at 711–12 (emphasis added). In the case of the plaintiff herein, the contractual obligations alleged are the warranty of quantity and the obligation to deal in good faith. That these contractual obligations may have been breached by such torts as are alleged by plaintiff makes these claims, and we so find, ones for "tortious breach of contract," not ones within the forbidden category of "sounding in tort."

Defendant's cases are inapposite to either influence or change this result. In two of the cases defendant has cited from the predecessor Court of Claims, *Somali Development Bank,* 508 F.2d at 817, and *Aetna Casualty and Surety Co.,* 655 F.2d at 1047, the jurisdictional dismissal was based on the fact that the actual obligations defendant was *alleged* to have breached stemmed from *tort,* not the requisite privity of contract between the plaintiff and the government. As evidence of this, in both cases, the court in fact even dismissed plaintiff's alternative implied contract theories being unable to find any

facts which put the government in the position of having contracted for the obligations it was alleged to have breached. Quite simply, the non-contractual duties allegedly breached and dismissed as outside the Tucker Act in *Somali* and *Aetna* are not analogous and cannot control the results which obtain where the claims of the instant plaintiff are grounded clearly on an acknowledged privity of contract.

Defendant also relies on a quote from the Supreme Court's decision in *Neustadt*, 366 U.S. at 696, 81 S.Ct. at 1294. In that case, the issue was: "whether the United States may be held liable, under the Federal Tort Claims Act [FTCA], 28 U.S.C. § 1346(b), to a purchaser of residential property who ... has been induced by the seller to pay a purchase price in excess of the property's fair market value." *Id.* at 697–98, 81 S.Ct. at 1296–97. While the factual analogy is tempting, we question how an interpretation of the FTCA can have any impact on an interpretation of the Tucker Act. In fact, as recently as 1980, the Supreme Court itself held that the construction of an exception to the FTCA in no way influenced "the jurisdiction of the Court of Claims under the Tucker Act." *See Hatzlachh Supply Co. v. United States*, 444 U.S. 460, 462–63, 100 S.Ct. 647, 649, 62 L.Ed.2d 614 (1980). And, if this case is not sufficiently pointed for a resolution of the issue, we direct defendant's attention to the earlier 1966 Court of Claims case of *Burtt*, 176 Ct.Cl. at 314, which similarly states:

> Accordingly, defendant's showing that the within case could not be brought in a district court under its Federal Tort Claims jurisdiction is really irrelevant to the jurisdictional inquiry in the Tucker Act context.

Overall, *Neustadt* also sheds little light on defendant's case.

e. *Tucker Act Jurisdiction Re 43 U.S.C. § 1181a*

 As stated *supra*, plaintiff also seeks compensation because defendant allegedly breached the statutory obligation, imposed pursuant to 43 U.S.C. § 1181a (1976), requiring it to sell plaintiff timber at "reasonable prices on a normal market." *Id.* Defendant strenuously challenges the subject matter jurisdiction of this court to award plaintiff money damages for any perceived violation of said statute because it does not mandate the payment of money damages. We agree with the defendant and hereby dismiss plaintiff's claim for compensation based on the alleged violation of 43 U.S.C. § 1181a for lack of subject matter jurisdiction.

 It is well settled that the Tucker Act, *ipso facto*, "does not create any substantive right enforceable against the United States for money damages." *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980), *quoting United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). To obtain relief with reference thereto, said substantive right must exist in some other express grant under the law, be it in the Constitution, an Act of Congress, or a regulation of an executive department. It is just simply not the case that citing to, or merely claiming, general noncompliance with a federal law gives rise to a cause of action within the narrow statutory intendment of the Tucker Act. On the contrary, to be entitled to relief in such circumstance, at a minimum, two preconditions must exist: (a) the claim itself, under the statute, must seek money damages against the United States; and (b) the claimant must demonstrate "that the source of substantive law he relies upon 'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" *Mitchell*, 463 U.S. at 216–17, 103 S.Ct. at 2967–68, *quoting Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 178 Ct.Cl. 599, 607 (1967).

In the case of plaintiff's claims under 43 U.S.C. § 1181a, the cause of action averred is without a doubt one which seeks to recover money damages. This is so because plaintiff contends that § 1181a secures to it a cause of action to protect it "from being forced to buy timber at excess prices" in view of the requirement that timber must

be "sold at reasonable prices on a normal market." However, we find that § 1181a in no way expresses an intention that violation thereof warrants monetary compensation to *buyers* of the timber sold thereunder. In fact, it strains credulity given the hospitable degree to which plaintiff has taken the phrase "at reasonable prices on a normal market" out of context.

### C. Plaintiff's Entitlement To Discovery Re Timber Underrun Claims

As stated herein above, in its effort to preclude an immediate decision on defendant's pending motion for summary judgment, plaintiff has moved this court on several occasions for a stay of proceedings to permit discovery pursuant to R.U.S.C.C. 56(f). While having denied plaintiff's motion on all such occasions, upon a thorough reconsideration, we hereby, *sua sponte*, vacate our most recent denial of August 16, 1985, as improvidently granted, and in turn grant plaintiff the right to undertake limited discovery premised on both R.U.S.C.C. 56(f) and those additional factors as outlined *infra*.

Summary judgment procedures in the Claims Court are described in R.U.S.C.C. 56 (*see* Rules revised February 15, 1984). Those procedures require, and the burden is on, the moving party to persuasively *show* "that there is no [genuine] issue as to *any* material fact" on the entire record and that it is therefore "entitled to judgment as a matter of law." R.U.S.C.C. 56(c); *Balboa Insurance Co. v. United States*, 775 F.2d 1158 (Fed.Cir.1985); *SRI International v. Matsushita Electric Corp.*, 775 F.2d 1107 (Fed.Cir.1985). *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444 (2d Cir.1980).[24] With respect to the non-moving party, the rule provides that:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his

pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

R.U.S.C.C. 56(c). In interpreting this latter provision, the Federal Circuit has held that: "*After* the moving party has *clearly* established its case, the duty to go forward shifts to the party opposing the motion to produce evidence that places material facts in dispute." (emphasis added). *Balboa Insurance Co.*, 775 F.2d at 1163. However, as reasoned by the Second Circuit in construing the identical language of F.R.C.P. 56, "the mere possibility that a factual dispute *may* exist, without more, is not sufficient to overcome a convincing presentation by the moving party." On the other hand, when and if the non-movant comes forth with "affidavits or other materials ... that generate uncertainty as to the true state of any material fact, ... summary judgment is inappropriate." Moreover, in that connection, "the court must resolve all ambiguities and draw all reasonable inferences in favor of the [non-movant]." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980).

In addition to the foregoing criteria, both the courts and R.U.S.C.C. have required the consideration of certain additional factors in connection with ruling on summary dispositions in order to avoid any undue harshness. In staying defendant's motion for summary judgment and, in granting plaintiff additional discovery, we also consider special factors, *i.e.*:

> (1) whether the existence of complex and far-reaching issues of contract interpretation makes a summary disposition here, without a more complete factual record, inappropriate; and

> (2) whether basic information essential to plaintiff's case currently rests exclusively within the possession of the de-

---

**24.** *Quinn* interprets F.R.C.P. 56, which rule essentially mirrors R.U.S.C.C. 56 (February 15, 1984).

fendant without which it has been unable to properly respond to defendant's motion.

We begin our discussion, however, by reflecting on the extent to which defendant has carried its burdens, as the moving party, of showing (a) no genuine issues of material fact, and (b) that it is entitled to judgment. Next, we briefly discuss the existence of the two special factors, *i.e.*, complex issues and facts exclusively within the possession of the defendant.

1. *Sufficiency of Defendant's Showing Re Warranty, Bad Faith and Misrepresentation*

a. *Genuine Issues Of Material Fact*

Regarding the original breach of warranty theory, we agree with defendant that *considered alone*, this theory is one which presents a clear question of law in which case summary judgment might be appropriate. The predecessor Court of Claims so held at 230 Ct.Cl. at 1041. However, we are concerned with the implications of the interrelationship of plaintiff's unconscionability argument on any disclaimer of warranty of quantity by defendant. To the extent that the impact of this doctrine could have broad implications for this case's breach of warranty issue, said issue was *not* passed on in the decision at 230 Ct.Cl. at 1041.

Exacerbating the complexity of the above is the fact that the doctrine of unconscionability has had little substantive development in this court or the predecessor Court of Claims. There is, however, an ancient standard articulated in *Hume v. United States,* 21 Ct.Cl. 328 (1886), *aff'd,* 132 U.S. 406, 10 S.Ct. 134, 33 L.Ed. 393 (1889), and some limited attempt to update it by reference to the UCC in *Fraass Surgical Mfg. Co., Inc. v. United States,* 571 F.2d 34, 215 Ct.Cl. 820 (1978), and *Louisiana-Pacific Corp. v. United States,* 656 F.2d 650, 228 Ct.Cl. 363 (1981). There is also some discussion of the doctrine and

factors bearing on its application by the Federal Circuit in *Peters v. United States,* 694 F.2d 687 (Fed.Cir.1982).[25]

Whatever the state of the doctrine in this circuit, we observe that although the issue of unconscionability has been viewed as a question of law, the parties are normally allowed to submit evidence shedding light on its existence or non-existence, such as the general commercial background and the commercial needs of the particular trade during the bargaining situation. *See, e.g.,* UCC § 2–302; *accord Peters,* 694 F.2d at 694–95; *County Asphalt, Inc. v. Lewis Welding & Eng. Corp.,* 323 F.Supp. 1300 (S.D.N.Y.1970), *aff'd,* 444 F.2d 372, 378–79 (2d Cir.), *cert. denied,* 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 (1971); *Price Bros. Co. v. Olin Const. Co.,* 528 F.Supp. 716, 720 (W.D.N.Y. 1981). While we express *no ultimate* opinion on the unconscionability and breach of warranty issues at this posture, we feel that under the authorities cited above, it is appropriate that we stay defendant's motion relative to plaintiff's breach of warranty theory and award plaintiff limited discovery relative to the unconscionability issue under the same rubric of discovery which is awarded, *infra,* pursuant to R.U. S.C.C. 56(f).

Addressing the bad faith and misrepresentation claims briefly, the sharp question of whether issues of fact are germane to these determinations turns on the purely legal question postulated by the defendant, *i.e.,* whether even assuming bad faith and misrepresentation, plaintiff cannot prevail. The resolution of this issue, however, has been clouded by two factors which we believe lend further support to the need for some further limited discovery. First, as discussed *infra,* there is the perhaps somewhat weak, although not meritless, showing by defendant of its entitlement to summary judgment on these issues as a matter of law.

---

**25.** Citing from *Hume,* an unconscionable contract has been defined as one "which no man in his senses, not under a delusion, would make,

on the one hand, and which no fair and honest man would accept on the other." *Hume,* 21 Ct.Cl. at 330.

Second, there is the question of defendant's "worst case" scenario concession, of bad faith and misrepresentation in the inducement, in order to overcome factual issues for purposes of this motion. It is plaintiff's position that the *degree* of bad faith is a relevant disputed fact for purposes of the motion. While initially embracing a "worst case" scenario, defendant has, at various times, clouded this position, relative to degree, by attempting to *exclude* certain scenarios.[26] This vacillation by defendant creates severe problems in the court's mind relative to *the* degree of bad faith, if any, is *actually* being conceded by defendant for purposes of obviating issues of fact. Absent an all-encompassing factual concession by defendant, which we believe is necessary to preclude *all* genuine issues of material fact, the breadth of our discussion must be based on the *actual* facts of the case. In other words, there is no "middle ground."

Defendant's qualified factual concession(s), therefore, in conjunction with our following observations relative to defendant's showing of entitlement, further supports the need for some additional limited discovery to properly lay out the precise confines of our ruling. In view of the foregoing, and the fact that motive and intent might be implicit in bad faith issues, we are not satisfied at this posture of the *non-existence* of genuine issues of material fact relative to the bad faith and misrepresentation claims. We are therefore staying defendant's motion with respect to such claims pending further limited discovery under the same rubric of that awarded pursuant to R.U.S.C.C. 56(f), *infra.*

#### b. *Entitlement As A Matter Of Law*

Next, in support of its entitlement to summary judgment as a matter of law, the defendant pursues two somewhat interrelated lines of argument. First, defendant presses on this court its firm belief that because "[t]he issue[s] raised in this motion [*i.e.*, breach of warranty, bad faith, and

misrepresentation are] identical, in every material respect, to that already decided by the Court of Claims in *Gregory Lumber Co. v. United States,*" 230 Ct.Cl. 1041 (1982), the previous grant of summary judgment to defendant should result in a similar award of summary judgment on these motions. Defendant's Motion for Summary Judgment, January 18, 1983, at 10. Second, defendant makes the broad assertion "that even if the purported underruns did exist and could not be reasonably explained, there is no legal basis for the plaintiff's claim." *Id.* at 8. This latter argument was clarified at oral argument to aver that even *assuming* the existence of misrepresentation and bad faith, based on the warranties of the plaintiff and the disclaimers by the defendant, as a matter of law, the plaintiff cannot prevail.[27]

Defendant's first argument, allegedly relying on "nearly identical contracts and fact situations" relative to the prior decision at 230 Ct.Cl. 1041, is potentially vulnerable on at least two important points. Initially, we note that the vitality of any argument relying solely on the *prior* Court of Claims decision at 230 Ct.Cl. 1041, in support of *this* motion, is diluted by the fact that the amended bad faith and misrepresentation theories subsequently pleaded here were simply *not* before the court in docket 134–81C. Next, and equally important, relative to the impact of the decision at 230 Ct.Cl. 1041, is the fact that plaintiff's response regarding the effect of defendant's disclaimers on the unconscionability argument, if proven, could conceivably take this case out of the scope of the prior holding. This latter scenario contrasts markedly with the decision at 230 Ct.Cl. 1041 where there was no holding relative to the effect proof of unconscionability might have on the defendant's disclaimers.

As to its second point, we note at least at this posture, that defendant has not informed this court of any pointed case law,

---

26. Transcript of Proceedings, September 23, 1985, at 51.

27. Transcript of Proceedings, August 15, 1985, at 7–10.

nor have we been able to find any, so holding. This is not to say, however, that *upon a firmer factual background,* defendant's reasoning may not eventually prevail. At this posture, given the extent of defendant's showing, we simply feel that sound discretion favors not boldly ruling definitively on defendant's motion, but rather reaching slightly further in the direction of some limited factual development.

### 2. The Existence Of Complex And Far-Reaching Issues

In basic terms, what defendant is asking this court to rule on are issues framed from what it perceives to be an almost "liability-proof" contract. This circumstance is readily discernible when one considers that while disclaiming *any* liability for the shortfall in quantity of goods sold, and asserting the plaintiff's warranties, defendant asks this court to sanction its unspecified admitted bad faith practices (whatever they may be—for purposes of this motion) by holding that plaintiff, as a matter of law, is not entitled to judgment notwithstanding.

We hesitate to rush forward on such an invitation for the reason that we are firmly convinced that the underlying operative facts bearing on the dispositive issues have not been sufficiently developed in these complex cases. Thus, when we resolve all ambiguities and draw all reasonable inferences in favor of plaintiff, as we must, in these twelve cases we do not view them as meritless litigation required to be unmasked by summary disposition. Because the issues are complex and the facts relative thereto have not been developed to enable this court to sift out the true extent, if any, of genuine issues of material facts, this court is constrained to proceed with caution.

The Supreme Court's reasoning in *Kennedy v. Silas Mason Co.,* 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948), is indicative of our position:

We do not hold that in the form the controversy took in the District Court that tribunal lacked power or justification for applying the summary judgment procedure. But summary procedures, however salutary where issues are clear-cut and simple, present a treacherous record for deciding issues of far-flung import, on which this Court should draw inferences with caution *from complicated courses of legislation, contracting and practice.*

*We consider it the part of good judicial administration to withhold decision of the ultimate questions involved in this case until this or another record shall present a more solid basis of findings based on litigation* or on a comprehensive statement of agreed facts. While we might be able, on the present record, to reach a conclusion that would decide the case, it might well be found later to be lacking in the thoroughness that should precede judgment of this importance and which it is the purpose of the judicial process to provide.

*Id.* at 256–57, 68 S.Ct. at 1034 (emphasis added, footnotes omitted). Indeed, the "complicated course of ... contracting" involving broad disclaimers and warranties in the instant cases, given the substantive allegations of unconscionability, bad faith, and misrepresentation, raises issues whose interpretation in this context reaches this court, to the best of its knowledge, on a first impression basis. For these reasons, a more extensive factual record would best serve the interests of justice in this case. *Accord, National Cored Forgings, Inc. v. United States,* 115 F.Supp. 469, 126 Ct.Cl. 250, 261 (1953); *Knapp v. Kinsey,* 249 F.2d 797, 802–03 (6th Cir.1957); *Chapman v. Hawthorne Flying Service,* 287 F.2d 539, 541 (5th Cir.1961); *Williams v. Howard Johnson's Inc. of Washington,* 323 F.2d 102 (4th Cir.1963); *McWhirter Distributing Co., Inc. v. Texas, Inc.,* 668 F.2d 511, 519 (Temp.Emerg.CA 1981). We find, therefore, that the foregoing provides an additional reason to hold that a stay of defendant's motion is appropriate, for purposes of limited discovery to supplement the plaintiff's response.

3. *R.U.S.C.C. 56(f) And The Existence Of Facts Peculiarly Within The Knowledge Of Defendant*

As stated *supra,* our rules provide for a mitigation of the strictness of summary dispositions pursuant to R.U.S.C.C. 56. That provision is contained in R.U.S.C.C. 56(f) which states:

> Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Cases from this court interpreting this provision, while useful for background purposes, do not really go to the heart of the particular circumstances exigent herein. *See, e.g., Leyman Manufacturing Corp. v. United States,* 8 Cl.Ct. 535 (1985); *Cherry Hill Sand & Gravel Co., Inc. v. United States,* 7 Cl.Ct. 357 (1985). Therefore, we proceed in interpreting this provision by adopting the reasoning of the various circuit courts regarding the identical Rule 56(f) of the F.R.C.P.

Decisions from other circuits interpreting Rule 56(f) can generally be summarized by the following passage from Professor Moore, 6 Pt. 2 Moore's, Federal Practice ¶ 56.24 at 56–1424–28 (1982):

> Where ... the party opposing summary judgment timely presents his affidavit under Rule 56(f) stating reasons why he is presently unable to proffer evidentiary affidavits he directly and forthrightly invokes the trial court's discretion. Unless dilatory or lacking in merit, the motion should be liberally treated. Exercising a sound discretion the trial court then determines whether the stated reasons are adequate. And, absent abuse of discretion, the trial court's determination will not be interfered with by the appellate court.

This discretionary nature embodied in Rule 56(f) is supported by cases such as *Walters v. City of Ocean Springs,* 626 F.2d 1317,
1321 (5th Cir.1980), and *SEC v. Spence & Green Chemical Co.,* 612 F.2d 896, 901 (5th Cir.1980). In addition, we embrace with approval he requirement of a liberal construction of Rule 56(f), as applied in *Spence & Green Chemical Co.,* 612 F.2d at 896, and *Slagle v. United States,* 228 F.2d 673 (5th Cir.1956). *See also,* 10A Wright, Miller & Kane, Federal Practice and Procedure, § 2740 (2d ed. 1983).

While not precisely delineated in Rule 56(f), one of the more frequent circumstances upon which a stay is granted, and additional discovery is allowed thereunder, relates to situations where facts necessary to the non-moving party's opposition are exclusively within the possession of the moving party. *See, e.g.,* 10A Wright, Miller & Kane, Practice and Procedure § 2741 (2d ed. 1983); *Ward v. United States,* 471 F.2d 667, 670 (3d Cir.1973); *Costlow v. United States,* 552 F.2d 560 (3d Cir.1977); *Walters,* 626 F.2d at 1317. According to Wright, Miller & Kane, "the majority of the continuances granted under Rule 56(f) involve cases in which one party has exclusive knowledge of the relevant facts." 10A Wright, Miller & Kane, § 2741, and cases cited therein. Not surprising, this majority finds perhaps its greatest common denominator in the grant of such motions in cases where material issues center around "motive, intent, [or] knowledge...." *Id. See, e.g., Washington v. Cameron,* 411 F.2d 705, 710 (D.C.Cir.1969); *Schoenbaum v. Firstbrook,* 405 F.2d 215, 218 (*en banc*) (2d Cir.1968), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); *Cedillo v. International Association of Bridge, etc.,* 603 F.2d 7, 11 (7th Cir.1979).

Under the standard for applying Rule 56(f) articulated *supra,* we are convinced that a reasonable stay of proceedings and further discovery are clearly proper in the instant case. Beginning with that evidence, *infra,* which plaintiff *has* adduced for the court, it is apparent that the underlying issues can *only* be resolved through the discovery of relevant data possessed by and contained within the records of the U.S. Department of Interior, Bureau of

Land Management (BLM). Plaintiff has offered evidence of shortfalls in its recovered timber which average over the twelve contracts some 26 percent. *See* Appendix B. In addition to even this exorbitant average are alleged *individual* contract shortfalls of 30 percent, 35 percent and even 50 percent. *Id.* When through its limited discovery in the Dunn Ridge case plaintiff requested the field tally records regarding the scaling under that contract, plaintiff was told the original books were "lost." [28] When plaintiff asked to speak with the field worker who performed the scaling, plaintiff was told the cruise itself was in large part performed by an inexperienced temporary employee whose records—indicating even the employee's *name*—were also "lost." [29] While these facts could have a variety of explanations, the fact is, only through a thorough review of BLM records, etc., will the true facts surface and the issues be resolved. In sum, where as here plaintiff has alleged bad faith, given the astronomical shortfalls as high as in the 50 percent range, such circumstance compels this court to reject defendant's position that all avenues for the search of the true reasons for the shortfalls should be foreclosed to plaintiff.

Against the foregoing background, we believe the case of *Costlow v. United States, supra,* supports the grant of a stay and discovery. In *Costlow,* the plaintiff sought to recover personal injury damages stemming from a car accident. Plaintiff alleged that defendant, the United States, was exercising sufficient control over its independent-contractor-driver as to be held liable for the contractor's alleged negligence in causing the accident. While Cost-

low had moved to discover the "control" issue pursuant to Rule 56(f), the district court, basing its decision *solely* on the contract language citing the driver as an independent contractor, chose to dismiss the action. On appeal, the Third Circuit reversed the summary dismissal stating:

> Costlow contends that despite the contract the Postal Service in fact exercised control over the activities of the driver. He responded to the government's motion for summary judgment by saying that he needed additional discovery in order to justify his opposition. Rule 56(f) contemplates such a response, *and we have said that where the facts are in possession of the moving party a continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course.*

*Costlow,* 552 F.2d at 563–64 (emphasis added).

Procedurally, plaintiff herein faces, as plaintiff in *Costlow* faced, imminent summary dismissal with the only available opportunity a plea for relief under Rule 56(f). Like plaintiff in *Costlow,* plaintiff herein also requires the records of its opponent to develop the factual issues that will show its entitlement to a trial on the merits.

In short, as in *Costlow,* we also favor the liberal construction of Rule 56(f) and consequently affirm the general need for reasonable discovery herein where, as here, the facts are peculiarly within the knowledge of the defendant. Because we find that justice and fundamental fairness require that plaintiff be allowed further discovery, defendant's motion for summary

---

**28.** Affidavit of William L. Gray, at 7, Exhibit A, Plaintiff's Opposition To Defendant's Motion for Summary Judgment.

**29.** *See* Defendant's Response to Plaintiff's First Set of Interrogatories, at 2, Defendant's Reply Brief, Supplemental Index, at 313–14. The following response is contained therein:

ANSWER:

John Peacher did the original cruise.

\* \* \* \* \* \*

A summer temporary employee was assigned to help Mr. Peacher with the Dunn Ridge

Sale. Mr. Peacher supervised the employee and *instructed him to mark trees as Peacher performed the cruise and tally. The helper was also instructed to measure certain trees when asked by the cruiser.*

*The District has been unable to determine the name of the summer temporary employee* from its records or in interviews with key personnel. Records pertinent to summer employees are retained a maximum of three years.

judgment is therefore stayed pending the completion thereof.

## III. CONCLUSION

Consistent with the foregoing, the court therefore grants plaintiff reasonable discovery and stays a ruling on defendant's motions for summary judgment. Additionally, the court further rules as delineated in Section I.D., *supra*.

IT IS SO ORDERED.

# APPENDIX A

| BLM Contract no. & title (group of "7" / group of "4") | Contract date (signed) | Date C/O Denial | IBLA Docket No. | Appeal filed | IBLA Mtn/stay pro-cdgs filed | Mtn/stay granted/denied | Dismissal of appeal on Merits | IBCA Docket # | Appeal filed | IBCA Dismissal w/o prej. to w/in 90 days Ct Cl decision on CDA Juris. | Dismissal w/ prej. - failure to pros. w/in 90 days of | Dismissal w/ prej. on basis of lack of CDA jurisdiction | U.S. CLAIMS COURT Gregory Lumber Company - SJMs Case No. | Petition | Amended Petition(s) | DMSJ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RO90-TS6-64 Dunn Ridge | 5/10/76 | 8/14/79 | N/A | — | — | — | — | N/A | — | — | — | — | 428-80C | 9/13/80 | 4/21/81 1/12/83 | J 12/11/80 1/18/83 |
| OR090-TS6-81 Simonsen Road | 6/8/76 | 9/28/79 | 80-60 | 10/10/79 | 4/10/80(P) | — | | 1312-10-79 | 10/16/79 | 3/12/80 | 1/23/85 | — | 532-80C | 9/26/80 | 4/8/81 1/12/83 | J 9/3/81 z 1/24/83 R |
| OR090-TS7-21 Bounds Creek | 4/14/77 | 5/14/79 | 80-418 | ND* | 4/10/80(P) | — | | 1267-5-79 | 5/18/79 | 3/12/80 | 1/23/85 | — | 578-80C | 10/23/80 | 4/9/81; 4/27/82 12/29/82; 1/12/83, | 1/24/83 |
| OR090-TS6-95 Collins Creek | 7/9/76 | 11/21/79 | 80-257 | 12/18/79 | 4/10/80(P) | | | 1326-1-80 | 12/18/79 | 3/12/80 | 1/23/85 | — | 626-80C | 11/21/80 | 4/21/81 1/12/83 | J 9/15/81 z 1/18/83 |
| OR090-TS6-27 Russell Creek | 10/3/75 | 11/21/79 | 80-371 | 12/7/79 | 4/10/80(P) | | | 1320-12-79 | ND* | 3/12/80 | 1/23/85 | — | 627-80C | 11/21/80 | 4/8/81 1/12/83 | 1/18/83 |
| OR090-TS6-19 Gettings Crk | 9/3/75 | 11/21/79 | 80-372 | ND* | 4/10/80(P) | | | 1324-1-80 | 12/18/79 | 3/12/80 | 1/23/85 | — | 628-80C | 11/21/80 | 4/9/81 1/12/83 | 1/18/83 |
| OR090-TS6-73 Low Pass | 5/2/75 | 11/29/79 | 80-323 | 12/18/79 | 4/10/80(P) | | | 1327-1-80 | 12/18/79 | 3/12/80 | 1/23/85 | — | 637-80C | 11/26/80 | 4/9/81 1/12/83 | 1/18/83 |
| 36090-TS5-49 Fish Creek | 2/5/75 | 11/21/78 | 79-127 | 12/8/78 | 2/6/79 (D) | — | 4/30/81(D) 6/2/81 (aff'd) | 1238-12-78 | 12/8/78 | — | — | 9/28/79 11/23/79 3/11/80 | 134-81C | 3/9/81 | — | No motion pending. |
| OR090-TS6-18 Salmon Crk | 9/4/75 | 11/20/78 | 79-127 | 12/8/78 | 2/6/79 (D) | — | 4/30/81(D) 6/2/81 (aff'd) | 1239-12-78 | 12/8/78 | — | — | 9/28/79 11/23/79 3/11/80 | 135-81C | 3/9/81 | 1/12/83 | 1/18/83 |
| OR090-TS7-9 Pordle Crk | 12/17/76 | 11/21/78 | 79-127 | 12/8/78 | 2/6/79 (D) | — | 4/30/81(D) 6/2/81 (aff'd) | 1237-12-78 | 12/8/78 | — | — | 9/28/79 11/23/79 3/11/80 | 136-81C | 3/9/81 | 1/12/83 | 1/18/83 |
| OR090-TS6-60 Rat Creek | 3/4/76 | 11/21/78 | 79-127 | 12/10/78 | 2/6/79 (D) | — | 4/30/81(D) 6/2/81 (aff'd) | 1240-12-78 | 12/8/78 | — | — | 9/28/79 11/23/79 3/11/80 | 137-81C | 3/9/81 | 1/12/83 | 1/18/83 |
| OR090-TS6-75 Eccles Rest | 5/7/76 | 6/6/79 | 79-509 | 6/15/79 | 4/10/80(P) | | | 1273-6-79 | 6/13/79 | 3/12/80 | 1/23/85 | — | 146-81C | 3/11/81 | 4/8/81 12/29/82 1/12/83 | 2/9/83(RW) 3/12/82 |

* ND: Missing Document

APPENDIX B

## Total Variances and Overpayment

| Tract | Contract Value | BLM Estimated Net Footage | Gregory Recovery | Shortage in Feet | Shortage in % | Overpayment |
|---|---|---|---|---|---|---|
| Salmon Creek | $1,270,364.10 | 8,945,400' | 6,104,870' | 2,840,530' | 31.76% | $418,497.51 |
| Fish Creek | 1,337,107.80 | 9,539,500' | 6,131,500' | 3,408,000' | 35.72 | 500,691.68 |
| Poodle Creek | 368,333.25 | 2,230,600' | 1,546,290 | 684,310' | 30.68 | 115,958.57 |
| Rat Creek | 499,618.05 | 3,159,700' | 2,011,330' | 1,148,370' | 36.35 | 194,546.05 |
| Dunn Ridge | 204,030.65 | 1,234,000' | 610,790' | 623,210' | 50.00 | 104,700.40 |
| Simonsen Road | 552,937.42 | 3,189,000' | 2,574,400' | 614,560' | 20.00 | 104,365.98 |
| Collins Creek | 393,263.00 | 2,674,000' | 2,436,310' | 237,690' | 8.89 | 38,030.42 |
| Bounds Creek | 870,479.08 | 4,288,000' | 3,995,070' | 292,930' | 6.84 | 71,335.69 |
| Low Pass | 768,702.50 | 4,105,700' | 3,181,250' | 924,450' | 22.55 | 184,802.10 |
| Russell Creek | 1,333,390.70 | 7,925,500' | 6,254,030' | 1,671,470' | 21.09 | 281,619.60 |
| Gettings Creek | 453,984.25* | 3,202,500' | 2,640,930' | 561,560' | 17.54 | 72,280.82 |
| Eagles Rest | 328,664.29 | 2,873,000' | 1,998,000* | 875,000* | 30.00* | 159,724.70* |
| | $8,380,875.09 | 53,366,900' | 39,484,810' | 13,882,090' | 25.95% | $2,246,553.52 |

*Estimate

Submitted to Court by Plaintiff.